A08A1499. MORTON et al. v. GLYNN COUNTY BOARD OF TAX ASSESSORS.

A08A1500. NEWMAN v. GLYNN COUNTY BOARD OF TAX ASSESSORS.

A08A1501. FISHER et al. v. GLYNN COUNTY BOARD OF TAX ASSESSORS.

(670 SE2d 528)

ADAMS, Judge.

William Allen Morton, Daisy Morton, James O. Newman, Robert W. Fisher and Mary F. Davis (collectively "the taxpayers") appealed the 2002 property tax assessment on their Sea Island properties, contending that the Glynn County Board of Tax Assessors (the "County") had improperly included in the appraisal of their real properties the separate value of their memberships in the Sea Island Club (the "Club"), which they contend is nontaxable intangible personal property. These appeals progressed through the Glynn County Board of Tax Assessors and the Glynn County Board of Equalization to the superior court, which granted summary judgment to the County, and the taxpayers appeal that ruling. "Because

---

this is an appeal from a grant of summary judgment, we must conduct a de novo review of the record to determine if there are genuine issues of material fact." (Citation omitted.) *Burt Dev. Co. v. Lee County Tax Assessors*, 240 Ga. App. 451, 452 (2) (523 SE2d 81) (1999).

The Sea Island Company (the "Company") owns the Cloister hotel and resort on Sea Island and also develops residential real estate throughout southeast Georgia. In 1998, it created the Club and limited access to the Cloister's resort facilities[1] to people who buy property owned or developed by the Company, and to resort guests. The Company hoped that this would increase property values on Sea Island and the Company's other developments. Accordingly, since that time, the only way to join the Club has been to purchase real estate on Sea Island or in one of the Company-owned subdivisions on St. Simons.[2] The Mortons own a home on Sea Island. Fisher and Davis own undeveloped property, as does Newman. All have Club memberships.

The Club membership, once purchased, is personal to the property owner in that members who sell their real property do not have to sell their memberships along with the land. Instead, the member can retain his membership and access to the Club's facilities. But that member cannot sell his membership directly to a third party. If he ever chose to relinquish that membership, he must resign and allow the Club to sell it.

The reality, however, is that most buyers make their purchase contingent upon obtaining a Club membership. Club policies allow a property owner to resign his membership in conjunction with the sale of his property and to arrange for "the buyer and his/her residential property to have preferred eligibility to apply for, and if approved for Membership, to acquire a Membership, irrespective of any waiting pool." The new purchaser must then submit an application and await approval before he can become a Club member. This procedure, therefore, does not directly convey membership from the seller to the buyer, but it makes a membership available and puts the buyer at the front of the line to apply for it.[3] Approval for membership is not automatic, but in most instances, the purchaser is approved and receives a membership as a matter of course. The old

---

[1] These facilities include a spa, a beach club, several golf courses, a shooting school, restaurants, a marina and horse stables.

[2] Only one of the approximately 1,000 to 1,200 properties in the Company's developments does not have a membership or an access to membership attached to it.

[3] Even if the seller decided to retain his membership, nothing in the membership policies appears to prohibit the buyer of a qualified property from applying for a membership, if available. Under that circumstance, the purchaser presumably would go into the "waiting pool" without preferred eligibility.

member then receives a refund of his original purchase price, and the new member pays the current market price for a membership, resulting in a profit to the Company not to the member.

When Glynn County assessed Sea Island property in 2002, it relied upon the sales prices of recently sold properties as reflected in transfer tax declaration forms filed with the county. All of the comparable properties the County relied upon were sold by sellers who agreed to relinquish their memberships for re-sale. The taxpayers engaged the services of a tax appraisal expert who ascertained that such properties sell for a higher price than properties sold without such potential for an immediate membership. He, therefore, concluded that the County had relied on sales figures, in which 25 percent of the overall value on undeveloped lots and 35 percent of the overall value on developed lots was attributable to the value of the Club membership.

The superior court ruled that although there was evidence that the value of the plaintiffs' real property had been enhanced by immediate access to a Club membership, that enhanced value must be included in the appraisal for ad valorem tax. The court relied upon Article VII, Section I, Paragraph III of the Georgia Constitution, which provides that "taxation shall be uniform upon the same class of subjects within the territorial limits" of the taxing authority, and OCGA § 48-5-1, which provides:

> The intent and purpose of the tax laws of this state are to have all property and subjects of taxation returned at the value which would be realized from the cash sale, but not the forced sale, of the property and subjects as such property and subjects are usually sold except as otherwise provided in this chapter.

The trial court found that the County would be in violation of these provisions if it excluded the enhanced value from ad valorem taxation, because it was part of the property's fair market value. And taxing the properties at below their fair market value would be granting the taxpayers preferential treatment.

1. The taxpayers contend, however, that they are not seeking preferential treatment, but rather are seeking equal treatment in not being assessed an ad valorem tax on intangible personal property. They assert that the value of the membership is distinct and severable from the fair market value of the real property, and thus the memberships themselves are intangible personal property. Accordingly, they argue that comparable sales prices do not reflect a property's fair market value, when a portion of those sales prices is attributable to such intangible property.

As the trial court noted, the intent of Georgia's tax laws is to tax properties at their fair market value. OCGA §§ 48-5-1, 48-5-6 ("[a]ll property shall be returned for taxation at its fair market value"). The fair market value of a property is defined as "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." OCGA § 48-5-2 (3). Accordingly, Georgia imposes taxes upon all owners of nonexempt real and tangible personal property at the property's fair market value. *Nat. Tax Funding v. Harpagon Co.*, 277 Ga. 41, 42 (1) (586 SE2d 235) (2003).

The Georgia Department of Revenue has adopted regulations, compiled as an "Appraisal Procedures Manual" ("APM"), to assist county tax officials in appraising tangible real and personal property. Ga. Comp. R. & Regs. r. 560-11-10-.01 (1). The APM defines "real property" as "the bundle of rights, interest and benefits connected with the ownership of real estate." Ga. Comp. R. & Regs. r. 560-11-10-.02 (1) (w). But "[r]eal property does not include the intangible benefits associated with the ownership of real estate, such as the goodwill of a going business concern," which are not subject to taxation.[4] Id. Accordingly, we must determine if the County's assessment included a tax upon any such intangible benefits.

The County concedes that a membership in the Club is an intangible personal property, but it contends that it is not taxing the value of the membership. Instead, it asserts that its appraisals are based upon the right to apply for membership. The County asserts that the two factors must be distinguished because the Club membership involves a separate transaction involving a third party. Memberships are not sold from person to person; they are sold by the Club. They argue that the right to apply for membership, as opposed to the Club membership itself, is not a commodity that can be bought and sold.

We agree with the parties that Club memberships per se are non-taxable intangible property, but we find that the County's assessment does not impose an ad valorem tax upon the memberships. The sale of membership is between the property owner and the Club, and involves a distinct consideration separate and apart from the sale of the real property. The County does not tax that transaction. Rather, the County based its appraisals of the taxpayers' properties on the value buyers are prepared to pay for real property with the right to apply for membership attached, using comparable

---

[4] Similarly, taxable personal property is "tangible personal property that may be seen, weighed, measured, felt or touched or which is in any other manner perceptible to the senses." Ga. Comp. R. & Regs. r. 560-11-10-.02 (1) (r). It does not include intangible property such as stocks, bonds, money, notes, accounts, patents, credits, copyrights, or franchises. Id.

sales prices on properties where the seller agreed to make his membership available for transfer to the buyer. Such properties sell at an enhanced value, not because they include a membership, but because the seller agrees to arrange that the buyer will have preferential eligibility for an available membership. It is this enhanced value, not the value of the membership itself, that is included in the county's appraisals.

This distinction is demonstrated by the fact that a Club member who wishes to resign a membership unconnected to any real property cannot obtain preferential treatment for any potential buyer. He merely grants the Club the authority to sell his membership and receives his deposit back. He does not recognize any other value for his membership. Therefore, the right to apply for membership of an available property and to receive preferential eligibility for an application is inextricably bound with the sale of qualified real property. This right cannot be transferred outside the property and thus is coexistent with it. While a seller may choose to retain his membership and thus not to realize the value of that right at the time he sells his property, that decision does not alter the fact that the value exists in the property. And the reality is that most buyers insist on obtaining that right when they buy the property and are willing to pay the enhanced value. Moreover, the Company created this system with the specific intent to increase the value of real estate in the Company's developments.

We conclude, therefore, that the County did not improperly include the value of the Club membership in its appraisals. We further hold that the County could properly include the enhanced value paid to the seller for the right to apply for membership as part of the fair market value of the property. This increased value is a benefit connected to the real property itself, rather than an intangible benefit such as goodwill. Goodwill is excluded from the definition of real property because it is "a favor which the management of a business wins from the public, and as such is more associated with a business operation than the property on which the business is located." (Punctuation and footnotes omitted.) *Pine Pointe Housing v. Lowndes County Bd. of Tax Assessors*, 254 Ga. App. 197, 200 (1) (b) (561 SE2d 860) (2002). The Company's membership policies, in contrast, were intended to increase the value of the real property and the rights granted under the policies cannot be separated from it. Accordingly, although the Club membership was not subject to taxation, the County was entitled to include the enhanced value attributable to the right to apply for membership as part of the properties' fair market value. Cf. *American Sheds v. County of Los Angeles*, 66 Cal. App. 4th 384, 392 (2) (Cal. App. 2d Dist. 1998) ("[I]n a real property case, intangibles associated with the realty, such as

zoning, permits, and licenses, are not real property and may not be taxed as such. However, insofar as such intangibles affect the real property's value, for example by enabling its profitable use, they may properly contribute to an assessment of fair market value," citing California tax code). See also *Roehm v. County of Orange*, 32 Cal. 2d 280, 285 (196 P2d 550) (1948).

The taxpayers also contend, however, that our decision should be guided by the Florida appellate court's decision in *Appleby v. Nolte*, 682 S2d 1140, 1141-1142 (Fla. App. 1996). That case involved properties in a resort development, which provided residents with the opportunity to obtain equity memberships in the resort's club, with two levels of access to club facilities. Most valuable were the full golf memberships, which provided greater benefits than those residents holding "sport special memberships." Id. at 1140. In appraising these properties, the county "took into consideration appellants' membership status in the Club when appraising the value of their property." Id. Properties owned by people with full golf memberships were assessed at values approximately 40 percent higher than homes owned by those with special sports memberships or no memberships. Id. The Florida court found first that the equity memberships were nontaxable intangible property under a state statute defining intangible property to include "all evidences of ownership in a corporation." Id. at 1142. And because the assessments were based on a list indicating those property owners who had full golf memberships and those who did not, the court concluded that the assessments were based in part on the value of the real estate and in part on evidence of corporate ownership in violation of Florida law. Id.

We find *Appleby* distinguishable. The resort policies in this case differed from those in *Appleby*. The Sea Island Club memberships do not represent an equitable ownership in the Club facilities. Rather, the Club's membership program materials make it clear that membership provides no equity or ownership interest, but instead only a revocable license to use the Club's facilities. Nor is any distinction drawn between the value of memberships, although dues are determined by the amenities to which the member chooses to have access. But more importantly, the Florida court based its decision on the county's improper methodology of drawing a distinction based upon the level of membership, thus considering the value of the membership in violation of Florida law. Unlike the county in *Appleby*, however, Glynn County did not base its assessment on the value of distinctive club memberships, but instead conducted its appraisals based upon the sales prices of comparable properties, a method specifically approved by the APM. Ga. Comp. R. & Regs. r. 560-11-10-.09 (1) (a).

The taxpayers assert, however, that the County could not simply rely upon comparable sales figures. They note that the APM is designed to provide fair market value under "normal circumstances," and "[w]hen unusual circumstances are affecting value, they should be considered." Ga. Comp. R. & Regs. r. 560-11-10-.01 (2). They assert that the Club membership in this case presents a "special circumstance." While the APM does not define "special circumstance," it does require the county using the comparable sales method of appraisal to make adjustments based upon market research. Ga. Comp. R. & Regs. r. 560-11-10-.09 (4) (b) (1) (ii). Among the factors to be considered in making such adjustments are "time of sale; location; physical characteristics; partial interest not conveyed; trades or exchanges included; [and] personal property included. . . ." Ga. Comp. R. & Regs. r. 560-11-10-.09 (4) (b) 2. But Club memberships are not directly conveyed, traded, exchanged or included in the sale of the real property. The only thing conveyed was real property with the right to receive preferential eligibility for membership attached. Accordingly, the APM does not mandate that an adjustment be made on the fair market value of the taxpayers' properties.

Moreover, "[i]n this State, a key tenet of property tax law is that all taxes must be fairly apportioned, or equalized, among taxpayers." *Dade County v. Eldridge*, 229 Ga. App. 401 (494 SE2d 106) (1997). See also *Lamplight Court Apts. v. DeKalb County Bd. of Tax Assessors*, 259 Ga. App. 642, 643 (1) (577 SE2d 814) (2003); *Dougherty County Bd. of Tax Assessors v. Burt Realty Co.*, 250 Ga. 467, 468-469 (298 SE2d 475) (1983); OCGA § 48-5-306. We agree with the trial court that it would be inequitable for the County to reduce the fair market value of these properties to account for the enhanced value afforded by the Club's policies.[5] To hold otherwise would allow the taxpayers to escape taxation on a portion of "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." OCGA § 48-5-2 (3).

2. The taxpayers also analogize the Club membership to a usufruct, which is not subject to taxation. See *Diversified Golf v. Hart County Bd. of Tax Assessors*, 267 Ga. App. 8, 10 (598 SE2d 791) (2004). A usufruct is the right to possess and enjoy the use of real estate for a fixed time or at the will of the grantor. OCGA § 44-7-1 (a). They assert that the Club membership is a usufruct because it is a

---

[5] Each of the taxpayers in this case has a Club membership, and their properties were appraised using comparable properties sold with memberships, which we have found to be an appropriate valuation in this case. However, we expressly do not address the issue of the appropriate appraisal methodology to be used on properties without the enhanced value of providing access to membership, as that issue is not before us.

revocable license to use the Club's property. But as we have held that the County did not tax the Club membership, we find no merit to this argument.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 26, 2008.

*Jordan & Moses, Randall A. Jordan, Christopher R. Jordan*, for appellants.

*Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, Gregory T. Carter, Aaron W. Mumford*, for appellee.