No. 14.—ALFRED ROUSE, plaintiff in error, vs. The STATE OF GEORGIA, defendant.

[1.] By the 8th Section of the 1st Article of the United States Constitution, it is enacted that the Congress shall have power " to coin money, and to regulate the value thereof, and to provide for the punishment of counterfeiting the current coin of the United States;" and in the 18th Section of the same Article, it is declared that "no State shall coin money." Have the individual States any jurisdiction over offences against the coin, or is it vested exclusively in Congress and the courts of the Union? Quere.

[2.] Proof of the passing in payment, of base metal in the likeness or similitude of gold coin, will not support an indictment for passing in payment " counterfeit gold coin."

[3.] An indictment which charges that the counterfeit coin was passed in payment to A. will not be sustained by evidence that it was passed in payment by the prisoner to B. through A., who was the innocent agent of the prisoner in the transaction.

[4.] Grand Jurors are competent Talesmen to try criminal causes.

Indictment for passing " counterfeit gold coin." Tried before Judge WARREN, in Baker Superior Court, December term, 1847.

Rouse *vs.* The State of Georgia.

The facts of this case are embodied in the opinion of the court.

H. MORGAN, for plaintiff in error, contended,

1st. That a grand juror is an incompetent talesman to try a criminal cause, not being the peer of the prisoner; that such was the law of England, as adopted in this State, and that the distinction is recognised in our own statutes. And in support of this position cited, 1 *Story on Const. ch.* 17. *Ib. p.* 130. *Schley's Dig. Pref. p.* 26. *Prince,* 912, 429, 33. 3 *Black. Com.* 350, 360. 4 *Bac. Ab.* 555, 549, 548. 2 *Eng. Com. L. Rep.* 483. 3 *Bl. Com. App.* 359. 1 *Kelly,* 635. *(Boon vs. the State.)*

2d. That the evidence showing Tharp acted as the agent of the prisoner, in passing the counterfeit coin to Johnson, did not support the indictment for *passing to Tharp;* and cited, 2 *Chit. Crim. Law,* 112, *note J.* 1 *Ib.* 213, 16, 233. 21 *Wend.* 527, 34. 2 *Stark.* 378.

3d. That the offences of passing "counterfeit gold coin," and " coin of base metal, having the similitude of gold coin," are distinct, and evidence of one will not support an indictment for the other, and cited, 3 *Story on Const.* 17. *Prince,* 635. 4 *Bac. Ab.* 315, 17. 5 *Petersdorff,* 526.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This is a writ of error to a judgment of the Superior court of Baker county, whereby the plaintiff was sentenced to confinement to hard labor in the Penitentiary for six years.

The indictment charged the defendant with the offence of passing counterfeit coin. And the specification is, that he passed and paid to one Benjamin Tharp, a certain forged and counterfeit gold coin, purporting to be a five dollar piece of American gold, of the value of five dollars. The defendant was arraigned, pleaded not guilty, and was tried and convicted.

The plaintiff complains that three errors were committed by the court below: 1st, In deciding that grand jurors were competent talesmen to try criminal causes. 2d, In admitting testimony to prove the passing and payment of counterfeit coin by the defendant, through *Tharp* to *Johnson,* when the indictment charged that the coin was passed and paid by the prisoner to *Tharp.* 3d,

In admitting in evidence, *base metal* in the likeness or similitude of gold coin, to support the charge in the indictment, "for passing and paying counterfeit gold coin."

[1.] The question has been much mooted, whether the State courts have concurrent criminal jurisdiction, over the offences of counterfeiting and passing the current coin of the United States. And in this, as in many other cases of real or supposed collision between the two governments, it is not always easy to determine where State sovereignty ends and Federal supremacy begins.

By the 8th Section of the 1st Article of the United States' Constitution, it is enacted that the Congress shall have power to coin money and to regulate the value thereof, and to provide for the punishment of counterfeiting the current coin of the United States; and in the 10th Section of the same Article, it is declared that no State shall coin money. Have the individual States any jurisdiction over offences against the coin, or is it vested exclusively in Congress and the courts of the Union ?

The rule laid down by Mr. Hamilton in the Federalist, and pretty generally adopted, is, that the alienation of State power exists in three cases only, namely, where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance authority to the Union, and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally contradictory and repugnant. *No.* 32.

Mr. Madison, in applying this test to that class of powers, conferred by the Constitution on Congress, in which the power over the coin and currency is included, remarks : " The punishment of counterfeiting the public securities, as well as the current coin, is submitted, of course, *to that authority* which is to secure the value of both." *Federalist, No.* 42.

Judge Story entertains the same view. " The next power of Congress is to provide for the punishment of counterfeiting the securities and current coin of the United States. This power would naturally flow as an incident from the antecedent powers to borrow money and regulate the coinage, and indeed without it those powers would be without any adequate sanction. This power would seem to be exclusive of that of the States, since it grows out of the Constitution as an appropriate means

Rouse *vs.* The State of Georgia.

to carry into effect other delegated powers not antecedently existing in the States." 3 *Com. on Const.* §1118.    See also 1 *Kent's Com. Sect.* 18, *and note, 5th Edit.*

One thing is very certain, namely, that the power of *coining* is not only vested in Congress, but that the individual States are divested of it.    It would seem to be clear, therefore, that the States have no jurisdiction whatever over the offence of counterfeiting money, coined at the mint of the United States, or any of its branches.    But whether an indictment lies in the State Courts, under State statutes, for counterfeiting any species of coin which is brought from foreign nations, or for *passing* counterfeit coin of any description, I forbear to express any opinion, as the point, although contained in the record, is not presented in the bill of exceptions.

This prosecution is based upon the 2d Section of the 7th Division of the Penal Code, which is as follows : "If any person shall falsely and fraudulently, make, forge, or counterfeit, or be concerned in the false and fraudulent making, forging, and counterfeiting of any gold, silver, or copper coin, which now is, or shall be passing or in circulation within this State, or shall falsely and fraudulently make, or be concerned in the false and fraudulent making of any base coin, of the likeness or similitude of any gold, silver, or copper coin, which now is, or shall be passing or in circulation within this State; or shall falsely and fraudulently utter, publish, pay, or tender in payment any such counterfeit and forged coin, of gold, silver, or copper coin, or of any base coin, knowing the same to be forged, or counterfeited, or base; or shall aid or abet, counsel, or command the perpetration of either of the said crimes, such person shall, on conviction, be punished by imprisonment and labor in the Penitentiary, for any time not less than four years, nor longer than ten years.    *Prince,* 635."

I will consider and dispose of the several errors alleged in the assignment, in the inverse order in which they stand.

[2.] 1st. Will proof of the passing in payment, of *base metal*, in the likeness or similitude of gold, support the charge in the indictment of passing in payment " counterfeit gold coin ?"    We think not.    And no other reason need be assigned, than that the statute itself has broadly made the distinction.    Penal statutes must be construed strictly, and there should be less variance between the allegations and the proof in criminal, than civil proceedings.—

Could a bond be given in evidence to support a simple contract, set out in the declaration? And yet the discrepancy would not be so great as that which exists between " counterfeit *gold* coin," and " *base metal*," in the likeness of gold. I am aware that it is extremely difficult to say what variances are or are not fatal in an indictment. Courts of law are frequently perplexed in deciding upon omissions that appear, on the first view of them, captious and trifling; but when it is considered that nothing is so important to a citizen as his liberty and his life, (for what will he not give in exchange for these?) any one will see and feel the necessity of a substantial compliance at least, with those forms of proceeding by which he is often deprived of the one or the other, or both.

[3.] 2d. This objection is equally fatal. . The indictment charged that the coin was passed and paid by the prisoner to Tharp, when the proof was, that it was passed and paid by the prisoner, through Tharp as *his* agent, to a man by the name of Johnson. Tharp, the first witness introduced in behalf of the prosecution, testified, " that prisoner gave him the coin to buy some articles for him, of Johnson, telling him at the time, to say to Johnson that it was good money, and to send him good money in exchange, as he wanted to travel on it. That he passed it to Johnson in payment for liquor and tobacco, bought for the prisoner, receiving the change, which he took back to the prisoner."

Had Rouse been indicted for *uttering* and *publishing* this coin, I would not say that the bare delivery of it to his agent, Tharp, for the purpose of being put into circulation would not have been sufficient. *Rex vs. Arscott,* 6 *Carr. and Payne,* 408. But he *is* charged with *passing* it in payment to Tharp, when the evidence is that he passed it to Johnson through the agency of Tharp. The English Parliament passed two statutes, one against *uttering* and *publishing,* and another against *disposing* of or *putting* away counterfeit money; our code comprises *both* offences in the same section. They are, however, totally different, and the same testimony will not convict in both.

Had Tharp been the agent of Johnson instead of Rouse, then the crime would have been complete, when the coin was placed in his hands, as this would have been a constructive delivery to Johnson. But the testimony shows directly the contrary, to wit: that Tharp was the innocent instrument of Rouse in this transac-

tion; and to hold that the coin was passed to *him*, would be in effect to say that the prisoner passed it to himself. The possession of his agent was his own possession; nor was it parted with in legal contemplation until it passed in payment to Johnson. To consummate the offence, there must be two parties concerned—the person tendering and the one receiving the counterfeit coin. It is true that when the coin was handed to Tharp, it was put in a course of transmission; but until it reached Johnson, for whom it was intended, and to whom it was sent, the guiit of the prisoner was inchoate. But the moment Johnson received, the felony was finished. Had Johnson, the disponee, owing to some casualty, never been reached, the prisoner might have been convicted of the *attempt;* but the offence of passing would not have been committed. The prosecution must prove, not only that the money put off was counterfeit, but that it was put off as stated in the indictment. The averment with regard to the mode of putting off must be proved as laid. *Roscoe's Crim. Ev.* 354.

But it may be argued that a person may be convicted of passing counterfeit money, to *unknown persons;* and that consequently it is no good objection to *mistake* the right person. I understand the rule to be this: while it is true that the indictment in many cases will lie where the persons are unknown by whom and against whom the crime was committed—and it is so set out in the indictment—still, these are exceptions to the general rule, justified by the particular circumstances which render a strict observance of the usual and proper practice incompatible with the ends of justice. As for instance, if the dead body of a person murdered be found, and it is impossible to discover who he was, an indictment for having killed some one unknown would be valid. 2 *Hale*, 181. Thus, also, in the indictment of the Regicides for having procured the death of Charles the First, the fact was agreed to be well laid as done by some one unknown, whose face was concealed by a vizor. *Com. Dig. Indictment, G.* 1.

I repeat, however, that these cases are founded in necessity and the fair presumption which exists that the names cannot be ascertained. But whenever the name of the party is known, it is absolutely necessary to insert it. And if the indictment charge that the counterfeit money was passed to persons, to the *jurors unknown*, yet if the person be really known, the allegation will be improper, and the prisoner must be discharged from that indictment and

Rouse *vs*. The State of Georgia.

tried upon a new one rectifying the mistake. 1 *East, P. C.* 181. 2 *Ib.* 651. 1 *Hale,* 572. 2 *Hawkins, B.* 2, *C.* 25, § 71. 2 *Leach,* 578. 3 *Campb.* 265, *note.* A *fortiori* will the indictment not stand when a wrong person is named in it as the one to whom the money was passed and the right person is fully disclosed by the proof. Upon another indictment for passing counterfeit money to Johnson, could *Autrefois acquit* or *Autrefois convict* be pleaded in bar? Clearly not.

[4.] Are Grand Jurors—not those who find the bill of indictment, but those whose names are in the Grand Jury box—competent to try criminal causes? In the opinion delivered by this Court in Warren J. Boon's case, (1 *Kelly,* 631,) it was pretty strongly intimated that there was no statute of the State which would authorize it. The correctness of this conclusion has been questioned, and the 38th section of the Judiciary Act of 1799, (*Prince,* 428,) is cited to show that all persons are capable to try criminal causes who are qualified to vote at elections for members of the Legislature.

It is conceded that the language of this section is broad enough to include Grand as well as Petit Jurors. It enacts—"That the Clerks of the Superior Courts of the respective counties, shall procure from the Tax-Collector of such county, and furnish to the Court, (within two months,) a list of all persons liable and qualified to serve as Grand and Petit Jurors, agreeably to the qualifications hereinafter prescribed; and all free male white citizens, above the age of twenty-one years and under sixty years, are declared to be qualified and liable to serve as *Petit* Jurors for the trial of all *civil* causes—for the recovery of debts or damages, to any amount whatsoever—but no person shall be capable to be of a jury for the trial of treason, felony, breaches of the peace, or any other cause of a criminal nature, or of any estate of freehold, or of the right to title or any lands or tenements, in any court of record within this State, who shall not be qualified to vote at elections for members of the Legislature; and if any person not qualified as aforesaid, shall be returned on any jury, he shall be discharged on the challenge and proof thereof of either of the parties to such suit, or on his own oath of the truth thereof; *provided* that no exception against any juror on account of his qualification shall be allowed after he is sworn." I quote the entire section. *Marbury and Crawford,* 303.

Rouse *vs.* The State of Georgia.

Are Grand Jurors embraced in this section ?    It would seem not from several considerations.   It purports to treat of *Petit* Jurors and to define *their* qualifications.   If it includes Grand Jurors, then no one of this body is capable to try criminal causes, or titles to lands, who shall not be qualified also to vote for members of the Legislature.   Has it been the practice to apply this test to members of that body ?   The ensuing sections treat of Grand Jurors—their qualifications—mode of summoning, &c.   It would appear, therefore, that they were not contemplated in the previous section.

But this construction does not depend upon inference.   By referring to sections 39 and 40 in *Marbury and Crawford's Digest, p.* 303, and which are omitted in *Prince* on account of their being superceded by the Act of 1805, the true intent and meaning of the Legislature in section 38 is placed beyond controversy.   Section 39 *provides* " That the Clerks of the several Courts are required, in the presence and under the direction of the Judge or Judges of such Court, to regulate and correct the several jury lists annually, by particularly specifying, in distinct columns, the persons most able, discreet and qualified, as herein before mentioned, to serve as Grand Jurors, which list so corrected shall be committed to the safe keeping of the Clerks of such Courts respectively ; and the Clerks of such Courts shall, immediately after receiving such lists, fairly enter the same in a book for that purpose, to be provided by such Clerk, (at his own expense,) distinguishing in separate columns the persons selected to serve as Grand Jurors, and those for the trial of civil and *criminal causes* as aforesaid, (that is, *Petit* Jurors as designated in the 38th section,) and the names of the persons so selected shall be written on separate pieces of paper and put into the different apartments of a jury box, to be provided by the Clerk at the public expense, in the construction and manner hereinafter prescribed, to wit : There shall be an apartment in the said jury box marked No. 1, in which shall be placed the names of all the persons selected to serve as Grand Jurors ; and another apartment marked No. 2, in which shall be placed the names of all the persons selected for the trial of civil and *criminal causes* as aforesaid," (namely, *Petit* Jurors, referring again to section 38.)

Section 40 : " And be it further enacted—that the Judge and Justices and Clerk of the Court, or person having custody of

the key, shall, previous to the adjournment of any Superior Court, or at least two months prior to the sitting of the next Court, cause to be drawn out of the apartment of said box marked No. 1, not less than twenty-three nor more than thirty-six names as Grand Jurors, and out of the apartment marked No. 2, not less than forty-eight, or more than seventy-two names as petit jurors, for the trial of civil and *criminal causes* as aforesaid," &c.

These sections refer constantly to Section 38, and identify the *petit* jury as the jury intended by that section, for the trial of criminal causes, and that its true interpretation is, that while all *Petit Jurors* are competent for the trial of all *civil* causes, for recovery of debts or damages, to any amount whatever, no *Petit* Juror shall be capable to try criminal causes, or those involving the title to lands, unless qualified to vote for members of the Legislature.

The Act of 1805, *(Prince,* 433,*)* passed for the better selection and drawing Grand Juries, &c., and which is supposed by the compiler to have superseded the 39th and 40th Sections of the Act of 1799, still retains the distinction which I have attempted to point out. I will cite a single clause only : " And the clerks of said courts shall, immediately after receiving such lists, fairly enter the same in a book for that purpose, to be provided at his own expense, distinguishing in separate columns, the persons liable to serve as Grand Jurors, and those for the trial of civil and *criminal* cases, *as pointed out by law,*" that is, by the 38th Section of the Judiciary Act of 1799. Can it be doubted that this paragraph refers to *Petit* Jurors?

Section 41, provides for the organization of the Grand Jury.

Section 42, declares that " the Clerk of the Court shall annex a pannel of the jury, containing the names of the persons drawn to serve on the grand inquest, exactly transcribed from the minute book to the precept for summoning such Grand Jury; and shall also annex another pannel containing the names of the persons drawn as *Petit* Jurors, for the trial of civil and *criminal* cases," &c.

Section 43, contains the form of the summons, which is as follows : " By virtue of the precept to me directed, you are hereby commanded to appear before the Judge of the Superior Court at the next Superior Court, to be held at the Court-House, in and for the county of ——— on the —— day of —— at ten o'clock in the forenoon of that day, to be sworn on the Grand Jury (or as a Juror for the trial of civil and

*criminal causes,* then and there depending, as the case may be.")

This section shows, as did those preceding it, that the *Petit* Jury is usually designated by no other name than as a "jury for the trial of civil and *criminal* cases."

Section 44, provides for the punishment, by fine, of defaulting Jurors—twenty dollars being the *maximum* for a *Petit,* and forty for Grand Juror—and then says : "And when from challenge or otherwise, there shall not be a sufficient number of Jurors to determine any civil or criminal cause, the Court may order the Sheriff or his deputy to summon bystanders or others, *qualified as herein-before required, for the trial of such cause or causes, sufficient to complete the panel,*" &c., viz : obviously Grand Jurors to make up the requisite number by law to compose that body, and *Petit Jurors* to complete the *Petit* Jury list—the latter being above the age of twenty-one and under sixty—to try civil causes, for the recovery of debts and damages, and qualified to vote for members of the Legislature, in order to be capable as *tales Petit* Jurors to try criminal causes and land titles.

This we believe to be a fair analysis of the statutes of the State, as to the persons intended to try criminal causes. And in corroboration of the soundness of this exposition, we might refer to the oaths administered to Jurors. We have the form of the oaths prescribed for Grand and Special Juries, and for *Petit* Juries, in civil and *criminal* cases. *Prince,* 430, 661. But nowhere do you find an oath to be administered to a *Grand* Juror in a *criminal case.* If Grand Jurors are competent, then, to try criminal causes, it is apparent that it must be by authority derived from some other source than our own State legislation. In other words, it must be upon the principles of *Magna Charta* and the Common Law, as guaranteed by the Constitution.

By the 5th section and 4th article of that instrument, it is declared that "Freedom of the press and *trial by jury, as heretofore used in this State, shall remain inviolate.*"

What was the trial by jury, as used in this State in 1798, the time when the Constitution was adopted ? For the answer to this enquiry we must refer to Judge Blackstone, whose commentaries constituted the law of this State, before and since the Revolution, and whose very language the authors of the Constitution have adopted in the clause which I have quoted. I will transcribe the

whole section, although the law of this, as well as any other question as to the qualifications of Jurors in criminal causes, is comprised in a single sentence.

" The trial by jury or the country, *per patriam*, is also that trial by the peers of every Englishman, which as the grand bulwark of his liberties, is secured to him by the great charter, (9 *Hen. III. C*, 29,) *nullus liber homo capiatur vel inprisonetur, aut exulet, aut aliquo alio modo destruatur, nisi per legale judicium parium suorum vel per legum terræ.*"

" The antiquity and excellence of this trial for settling of civil property, has before been explained at large. *See Book III, p.* 579. And it will hold much stronger in criminal cases, since in times of difficulty and danger, more is to be apprehended from the violence and partiality of Judges appointed by the crown, in suits between the king and the subject, than in disputes between one individual and another—to settle the metes and boundaries of private property. Our law has therefore wisely placed this strong and twofold barrier—a presentment and a trial by jury—between the liberties of the people and the prerogative of the crown. It was necessary for preserving the admirable balance of our Constitution—to vest the executive power of the laws in the Prince—and yet this power might be dangerous and destructive to that very Constitution, if exerted without check or control by justices of *Oyer* and *Terminer* occasionally named by the crown, who might then, as in France or Turkey, imprison, despatch or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. *But the founders of the English Law have, with excellent forecast, contrived that no man should be called to answer to the king for any capital crime, unless upon the preparatory accusation of twelve or more of his fellow subjects, the Grand Jury; and that the truth of any accusation, whether preferred in the shape of indictment, information or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion.* So that the liberties of England cannot but subsist, so long as this *palladium* remains sacred and inviolate; not only from all open attacks (which none will be so hardy as to make) but also from all secret machinations which may sap or undermine it; by introducing new and arbitrary methods of trial by Justices of the Peace, Commissioners of the Revenue and Courts of Conscience.

Rouse *vs.* The State of Georgia.

And however *convenient* these may appear at first, (as doubtless all arbitrary powers well executed are the most convenient,) yet let it be again remembered, that delays and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation, are fundamentally opposite to the spirit of our Constitution; and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern.   4 *Black. Com.* 350."

It is obvious that the framers of the Constitution, instead of incorporating the whole of this passage in that instrument, simply declare that the trial by jury, as therein delineated, shall remain inviolate.   The commentator, whose great work will constitute a text-book, so long as the law shall be an object of study and practice, predicted that the liberties of the country could not but subsist long as this *palladium*—the trial by jury—remains sacred and *inviolate.*   The men of '98, warmed by his enthusiasm in behalf of this institution, emphatically affirm *that it shall remain inviolate !*

I recur, then, to the enquiry, What is the sum and substance of this trial by jury ?   It is, "that the truth of every accusation shall be confirmed by the unanimous suffrage of twelve of the prisoner's equals and neighbors, (this last term meaning under the Constitution citizens of the county where the offence is committed,) indifferently chosen and superior to all suspicion."

A new trial was awarded by this Court to Kinchin P. Boon, because, as we thought, he was deprived of his constitutional right of selecting a jury who were " *superior to all suspicion.*"   1 *Kelly,* 618; and to Warren J. Boon, because eighteen of the *tales Jurors* who were put upon the panel were drawn from the Grand Jury box by the presiding Judge, and the list so drawn furnished to the Sheriff by the Court, with instructions to summon them to serve in the case, thus taking from the defendant, in the judgment of this Court, his constitutional right of electing a jury of his *"equals"* from the whole body of his fellow citizens of the county, qualified to serve as Jurors, "indifferently chosen " and put in the panel by the Sheriff."   1 *Kelly,* 631.

The attempt now made is exactly the reverse of the practice repudiated in this latter case.   It seeks to restrict the accused entirely to the *Petit Jury list.*   This cannot be done.   It would be unjust to

that class of the community who constitute the Grand Jury. By the Common Law all persons are entitled to be tried by their *peers.* This privilege is guaranteed by the Constitution to every citizen of this State. By our system, all men *are equal,* notwithstanding the distinctions created by statute between Grand and Petit Jurors. How, then, is this fundamental principle in criminal trials to be secured? By holding every citizen of the county, qualified by law to serve as a Juror, competent to be presented on the array by the Sheriff, and it is then for the accused to select twelve for his jury, who, "*from situation, condition in life, education, morals, employment and other circumstances,*" he shall feel to be his equals.

Believing then as we do, that the "*inroad*" now essayed upon this "*sacred bulwark*" of the people—trial by jury—is "*fundamentally opposite to the Constitution*" and spirit of the Common Law, we take pleasure in affirming the judgment of the Court below upon this ground.