S09A1432. ATLANTA OCULOPLASTIC SURGERY, P.C.
v. NESTLEHUTT et al.

(691 SE2d 218)

HUNSTEIN, Chief Justice.

This case requires us to assess the constitutionality of OCGA § 51-13-1, which limits awards of noneconomic damages in medical malpractice cases to a predetermined amount. The trial court held that the statute violates the Georgia Constitution by encroaching on the right to a jury trial, the governmental separation of powers, and the right to equal protection. Based on our review of the record and the applicable law, we find that the noneconomic damages caps in OCGA § 51-13-1 violate the constitutional right to trial by jury, and we therefore affirm.[1]

In January 2006, Harvey P. Cole, M.D., of Atlanta Oculoplastic Surgery, d/b/a Oculus, performed $CO_2$ laser resurfacing and a full facelift on appellee Betty Nestlehutt. In the weeks after the surgery, complications arose, resulting in Nestlehutt's permanent disfigurement. Nestlehutt, along with her husband, sued Oculus for medical malpractice. The case proceeded to trial, ending in a mistrial. On retrial, the jury returned a verdict of $1,265,000, comprised of $115,000 for past and future medical expenses; $900,000 in noneconomic damages for Ms. Nestlehutt's pain and suffering; and $250,000 for Mr. Nestlehutt's loss of consortium. Appellees then moved to have OCGA § 51-13-1, which would have reduced the jury's noneconomic damages award by $800,000 to the statutory limit of $350,000, declared unconstitutional. The trial court granted the motion and thereupon entered judgment for appellees in the full amount awarded by the jury. Oculus moved for a new trial, which was denied, and this appeal ensued.

1. In relevant part, OCGA § 51-13-1 provides:

> In any verdict returned or judgment entered in a medical malpractice action, including an action for wrongful death, against one or more health care providers, the total amount recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00, regardless of the number of defendant health care providers against whom the claim is asserted or the number of separate causes of action on which the claim is based.

---

[1] We express no opinion as to subsection (f) of OCGA § 51-13-1, which provides for periodic payment of future damages awards of $350,000 or more in medical malpractice actions.

Id. at (b). "Noneconomic damages" is defined as

> damages for physical and emotional pain, discomfort, anxiety, hardship, distress, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium, injury to reputation, and all other nonpecuniary losses of any kind or nature.

Id. at (a) (4). In addition to capping noneconomic damages against health care providers,[2] the statute also limits noneconomic damages awards against a single medical facility to $350,000; limits such awards to $700,000 for actions against more than one medical facility; and limits such awards to $1,050,000 for actions against multiple health care providers and medical facilities. Id. at (c), (d), (e).

Enacted as part of a broad legislative package known as the Tort Reform Act of 2005, the damages caps were intended to help address what the General Assembly determined to be a "crisis affecting the provision and quality of health care services in this state." Ga. L. 2005, p. 1, § 1. Specifically, the Legislature found that health care providers and facilities were being negatively affected by diminishing access to and increasing costs of procuring liability insurance, and that these problems in the liability insurance market bore the potential to reduce Georgia citizens' access to health care services, thus degrading their health and well-being. Id. The provisions of the Tort Reform Act were therefore intended by the Legislature to "promote predictability and improvement in the provision of quality health care services and the resolution of health care liability claims and . . . thereby assist in promoting the provision of health care liability insurance by insurance providers." Id. at p. 2.

2. We examine first the trial court's holding that the noneconomic damages cap violates our state Constitution's guarantee of the right to trial by jury.

> Duly enacted statutes enjoy a presumption of constitutionality. A trial court must uphold a statute unless the party seeking to nullify it shows that it "manifestly infringes upon a constitutional provision or violates the rights of the people." The constitutionality of a statute presents a ques-

---

[2] A "health care provider" is defined as any person licensed as a practitioner of medicine or other specified healing arts, as well as any partnership, professional corporation, or other entity comprised thereof, id. at (a) (2), as distinguished from hospitals and other institutional "medical facilities." Id. at (a) (3).

tion of law. Accordingly, we review a trial court's holding regarding the constitutionality of a statute de novo.

(Footnotes omitted.) *Rhodes v. State*, 283 Ga. 361, 362 (659 SE2d 370) (2008).

The Georgia Constitution states plainly that "[t]he right to trial by jury shall remain inviolate." Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a). It is well established that Art. I, Sec. I, Par. XI (a) "guarantees the right to a jury trial only with respect to cases as to which there existed a right to jury trial at common law or by statute at the time of the adoption of the Georgia Constitution in 1798. [Cit.]" *Benton v. Georgia Marble Co.*, 258 Ga. 58, 66 (365 SE2d 413) (1988). Accord *Tift v. Griffin*, 5 Ga. 185, 188-189 (1848). Prior to adoption of the 1798 Constitution, the General Assembly had adopted the common law of England and all statutes in force as of 1776 as the law of Georgia. *Warlick v. Great Atlantic & Pacific Tea Co.*, 170 Ga. 538 (2) (153 SE 420) (1930). Thus, the initial step in our analysis must necessarily be an examination of the right to jury trial under late eighteenth century English common law. See *Rouse v. State*, 4 Ga. 136, 145-147 (1848) (referring to Blackstone, "whose commentaries constituted the law of this State, before and since the Revolution," as authoritative on jury trial right as of 1798).[3]

(a) The antecedents of the modern medical malpractice action trace back to the 14th century.

> The first recorded case in England on the civil [liability] of a physician was an action brought before the Kings Bench in 1374 against a surgeon by the name of J. Mort involving the treatment of a wounded hand. The physician was held not liable because of a legal technicality, but the court clearly enunciated the rule that if negligence is proved in such a case the law will provide a remedy.

(Footnote omitted.) C. Joseph Stetler, The History of Reported Medical Professional Liability Cases, 30 Temp. L. Q. 366, 367 (1957). See also Allan H. McCoid, The Care Required of Medical Practitioners, 12 Vand. L. Rev. 549, 550 (1959). By the mid-18th century, the concept of "mala praxis" was sufficiently established in legal theory as to constitute one of five classes of "private wrongs" described by Sir William Blackstone in his Commentaries. 3 W. Blackstone, Commentaries on the Laws of England, Ch. 8, p. 122 (1772) ("For it

---

[3] Because there is only a sparse record of reported Georgia cases prior to the publication of the first volume of the Georgia Reports in 1846, Georgia precedent is of limited utility in ascertaining the extent of the jury trial right as of 1798.

hath been solemnly resolved, that *mala praxis* is a great misdemeanor and offense at common law, whether it be for curiosity and experiment, or by neglect"). The concept took root in early American common law, the earliest reported medical negligence case in America dating to 1794. *Cross v. Guthery*, 2 Root 90 (Conn. Super. 1794) (affirming jury's award of damages against surgeon for unskillful performance of operation). Given the clear existence of medical negligence claims as of the adoption of the Georgia Constitution of 1798, we have no difficulty concluding that such claims are encompassed within the right to jury trial under Art. I, Sec. I, Par. XI (a). This conclusion is bolstered by the fact that medical negligence claims appear in Georgia's earliest systematically reported case law, see *Smith v. Overby*, 30 Ga. 241 (1860) (action brought against physician for negligence in delivery of baby); *Perkins v. Attaway*, 14 Ga. 27, 29 (1853) (jury instruction in legal malpractice action stating that counsel was responsible to clients "just as a surgeon is responsible for an unskilful operation in surgery"), and the fact that the tort of medical malpractice was included in Georgia's earliest Code. See Code of 1861, § 2915 (effective Jan. 1, 1863).[4]

As with all torts, the determination of damages rests "'peculiarly within the province of the jury.'" (Citation omitted.) *Dimick v. Schiedt*, 293 U. S. 474, 480 (3) (55 SC 296, 79 LE 603) (1935). See also OCGA § 51-12-12 (a) ("[t]he question of damages is ordinarily one for the jury"). Because the amount of damages sustained by a plaintiff is ordinarily an issue of fact, this has been the rule from the beginning of trial by jury. See Charles T. McCormick, Handbook on the Law of Damages § 6, p. 24 (1935). See also 3 Blackstone, Commentaries, supra, Ch. 24, p. 397 ("the *quantum* of damages sustained by [a plaintiff] cannot be [ascertained] without the intervention of a jury"). Hence, "[t]he right to a jury trial includes the right to have a jury determine the *amount* of . . . damages, if any, awarded to the [plaintiff]." (Emphasis in original.) *Feltner v. Columbia Pictures Television, Inc.*, 523 U. S. 340, 353 (III) (118 SC 1279, 140 LE2d 438) (1998).[5] Accord *Western & Atlantic R.R. v. Abbott*, 74

---

[4] Though such actions were not at the time denominated as "negligence" or "medical malpractice" actions, see, e.g., *Smith*, supra, 30 Ga. at 241 (negligence in delivery of baby brought as "action on the case"), it is clear that they were, in substance, precursors to the modern medical malpractice action.

[5] Though it is argued that the damages determination does not fall within the scope of the right to jury trial, we note that the primary case relied on for this proposition, *Tull v. United States*, 481 U. S. 412 (107 SC 1831, 95 LE2d 365) (1987) (Seventh Amendment does not guarantee right to jury assessment of civil penalties), has been limited expressly by the U. S. Supreme Court to apply only to the determination of civil penalties and not actual damages, which the Court has since explicitly found to be an issue for jury determination. *Feltner*, supra, 523 U. S. at 355 (III).

Ga. 851 (3) (1885) (pain and suffering damages to be measured according to enlightened conscience of impartial jurors).

Noneconomic damages have long been recognized as an element of total damages in tort cases, including those involving medical negligence. See 3 Blackstone, Commentaries, supra, Ch. 8, p. 122 (victim of mala praxis entitled to recover for "all personal wrongs and injuries"); *Scott v. Sheperd*, 95 E. R. 1124, 1126 (K.B. 1773) (damages awarded in part for "excruciating pain and torment"). See also *Grannis v. Branden*, 5 Day 260 (Conn. 1812) (recovery sought for "great and unnecessary pain" in medical negligence case); *Atkinson v. Hains*, 6 N.J.L. 327 (1796) (sanctioning recovery for loss of services); *Cross*, supra, 2 Root 90 (affirming award of damages for loss of consortium occasioned by medical negligence); *Beebe v. Trafford*, 1 Kirby 215 (Conn. Super. 1787) (involving award of damages for, inter alia, pain and distress). Early reported Georgia case law confirms the recognition of the right to recover damages for "mental sufferings." See *Smith*, supra, 30 Ga. at 245 (reversing defense verdict in medical malpractice action due to, inter alia, misleading jury instructions regarding recoverable damages).

> [T]he constitutional provision[ ] [guaranteeing the right to trial by jury] preserved not merely the form or mode of trial, but the right of trial by jury *in all its essential elements* as it existed at common law and as it obtained in this State at the date of the adoption of our earliest constitution. [Cit.]

(Emphasis supplied.) *Pollard v. State*, 148 Ga. 447, 454 (96 SE 997) (1918). Based on the foregoing, we conclude that at the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury.

(b) We next examine whether the noneconomic damages caps in OCGA § 51-13-1 unconstitutionally infringe on this right. By requiring the court to reduce a noneconomic damages award determined by a jury that exceeds the statutory limit, OCGA § 51-13-1 clearly nullifies the jury's findings of fact regarding damages and thereby undermines the jury's basic function. See *Lakin v. Senco Prods., Inc.*, 987 P2d 463, 473 (Or. 1999) ("to the extent that the jury's award exceeds the statutory cap, the statute prevents the jury's award from having its full and intended effect"). Consequently, we are compelled to conclude that the caps infringe on a party's constitutional right, as embodied in Art. I, Sec. I, Par. XI (a), to a jury determination as to noneconomic damages. See id. at 475

(noneconomic damages caps violate right to trial by jury); *Moore v. Mobile Infirmary Assn.*, 592 S2d 156 (Ala. 1991) (same); *Sofie v. Fibreboard Corp.*, 771 P2d 711 (III) (Wash. 1989) (same). See also *Smith v. Department of Insurance*, 507 S2d 1080 (II) (Fla. 1987) (plaintiff does not receive constitutional benefit of jury trial where jury verdict arbitrarily capped).

The fact that OCGA § 51-13-1 permits full recovery of noneconomic damages up to the significant amount of $350,000 cannot save the statute from constitutional attack. "[I]f the legislature may constitutionally cap recovery at [$350,000], there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000, or $1,000, or even $1." *Smith*, supra, 507 S2d at 1089. The very existence of the caps, in any amount, is violative of the right to trial by jury.

Contrary to appellant's assertion, *State of Ga. v. Moseley*, 263 Ga. 680 (2) (436 SE2d 632) (1993) and *Teasley v. Mathis*, 243 Ga. 561 (2) (255 SE2d 57) (1979) do not support a different result, as these cases addressed statutory limits on *punitive* damages, which, "[u]nlike the measure of actual damages suffered . . . [are] not really a 'fact' 'tried' by the jury." (Citations omitted.) *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U. S. 424, 437 (III) (121 SC 1678, 149 LE2d 674) (2001) (because punitive damages award does not constitute finding of fact, potential limitations on size of awards do not implicate Seventh Amendment jury trial right). See also OCGA § 51-12-5.1 (c) ("[p]unitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant"); *Brown & Williamson Tobacco Corp. v. Gault*, 280 Ga. 420 (1) (627 SE2d 549) (2006) (distinguishing punitive and compensatory damages). In addition, both cases dealt primarily with equal protection and/or due process challenges, reserving only cursory analysis to the right to jury trial issue, which was summarily resolved in reliance on precedent that did not address the right to jury trial at all. See *Teasley*, supra at 563 (2) (citing three U. S. Supreme Court cases, none of which involved challenge on right to jury trial grounds); *Moseley*, supra at 681 (2) (relying primarily on *Teasley*).

Though we agree with the general principle stated in *Moseley* and *Teasley* that the Legislature has authority to modify or abrogate the common law, we do not agree with the notion that this general authority empowers the Legislature to abrogate *constitutional* rights that may inhere in common law causes of action. See *Dimick*, supra, 293 U. S. at 487 (3) ("To effectuate any change in [common law rules embodied in right to jury trial] is not to deal with the common law, *qua* common law, but to alter the Constitution"); *Georgia Lions Eye Bank, Inc. v. Lavant*, 255 Ga. 60, 61-62 (2) (335 SE2d 127) (1985)

(common law "'may be changed at the will, or even at the whim, of the legislature, *unless prevented by constitutional limitations*'" (citation omitted; emphasis supplied)). Likewise, while we have held that the Legislature generally has the authority to define, limit, and modify available legal remedies, see, e.g., *Frantz v. Piccadilly Place Condominium Assn.*, 278 Ga. 103 (2) (597 SE2d 354) (2004) (upholding addition of remedy in statute governing condominium instruments); *Murphey v. Murphey*, 215 Ga. 19 (108 SE2d 872) (1959) (upholding change to enforcement procedures under child support act), the exercise of such authority simply cannot stand when the resulting legislation violates the constitutional right to jury trial.

Nor does, as appellant asserts, the existence of statutes authorizing double or treble damages attest to the validity of the caps on noneconomic damages. While it is questionable whether any cause of action involving an award thereof would constitute an analogue to a 1798 common law cause of action so as to trigger the right to jury trial in the first place,[6] to the extent the right to jury trial did attach, treble damages do not in any way nullify the jury's damages award but rather merely operate upon and thus affirm the integrity of that award.[7]

We must also reject the argument that the noneconomic damages caps pose no greater threat to the right to jury trial than the courts' exercise of their remittitur power. Judicial remittitur, the power to reduce a damages award deemed clearly excessive, is a corollary of the courts' constitutionally derived authority to grant new trials under Art. VI, Sec. I, Par. IV of the Georgia Constitution. OCGA § 51-12-12 (b) (upon finding damages award to be clearly inadequate or excessive, trial court may condition grant of new trial upon any party's refusal to accept amount determined by trial court). See also *Spence v. Maurice H. Hilliard, Jr., P.C.*, 260 Ga. 107 (1) (389 SE2d 753) (1990) (trial court not authorized to remit verdict unless party agrees to remittitur in lieu of new trial). Unlike damages caps, which are automatically triggered when a damages award exceeds the threshold amount, judicial remittitur is a carefully circumscribed power, the exercise of which is authorized only in the limited circumstance where the "jury's award of damages is clearly so . . . excessive as to any party as to be inconsistent with the preponder-

---

[6] See, e.g., OCGA §§ 10-1-399 (c) (treble damages for intentional violations of Fair Business Practices Act); 20-3-514 (c) (treble damages for breach of educational loan or scholarship contract); 38-3-147 (treble damages for misappropriation for gain of Georgia Emergency Management Agency symbols or nomenclature); 44-5-48 (c) (treble damages for failure to disclose that property being sold was previously site of commercial landfill).

[7] The same may be said of awards of pre- or post-judgment interest, which is necessarily a function of, and merely added to, the jury's damages award.

ance of the evidence." OCGA § 51-12-12 (b). In fact, this Court has held that the Georgia remittitur statute does not violate the right to jury trial *precisely because* it does not confer on the courts the unfettered authority to alter jury verdicts. *Spence*, supra, 260 Ga. at 107 (1), (2). Accordingly, the contention that the damages caps are analogous to the courts' remittitur power is unfounded. See *Sofie*, supra, 771 P2d at 721 ("the legislative damages limit is fundamentally different from the doctrine of remittitur"); *Lakin*, supra, 987 P2d at 472-473 (distinguishing judicial remittitur from statutory damages caps).

In sum, based on the foregoing, we conclude that the noneconomic damages caps in OCGA § 51-13-1 violate the right to a jury trial as guaranteed under the Georgia Constitution.[8]

3. "The general rule is that an unconstitutional statute is wholly void and of no force and effect from the date it was enacted." (Citations omitted.) *City of Atlanta v. Barnes*, 276 Ga. 449, 452 (4) (578 SE2d 110) (2003). However, exceptions may be made to this general rule " 'where, because of the nature of the statute and its previous application, unjust results would accrue to those who justifiably relied on it. (Cits.)' [Cit.]" Id. In determining whether to deviate from the default rule of retroactivity, Georgia courts assess three factors: (1) whether the decision in question established a new principle of law either by overruling past precedent or deciding an issue of first impression, the resolution of which was not clearly foreshadowed; (2) whether retroactive application would further or retard the operation of the rule in question; and (3) whether retroactive application would result in substantial inequitable results. Id. at 453. Accord *Findley v. Findley*, 280 Ga. 454 (1) (629 SE2d 222) (2006).

In this case, we do not find that the above factors militate in favor of deviation from the general rule of retroactivity. As to the first factor, while our invalidation of the noneconomic damages caps

---

[8] While we recognize that this conclusion finds authority to the contrary from some other jurisdictions, those decisions are either governed by less comprehensive constitutional jury trial provisions, see, e.g., *Judd v. Drezga*, 103 P3d 135 (V) (Utah 2004) (constitution provides that right to jury trial "inviolate" only in capital cases); *Phillips v. Mirac, Inc.*, 651 NW2d 437 (III) (A) (Mich. App. 2002) (constitution provides that "right of trial by jury shall remain"); *Etheridge v. Medical Center Hosps.*, 376 SE2d 525 (III) (B) (Va. 1989) (constitution provides that "trial by jury is preferable . . . and ought to be held sacred"), or else employ unpersuasive reasoning reaching the opposite result. See, e.g., *Arbino v. Johnson & Johnson*, 880 NE2d 420 (III) (A) (1) (Ohio 2007); *Kirkland v. Blaine County Med. Center*, 4 P3d 1115 (IV) (A) (Idaho 2000); *Murphy v. Edmonds*, 601 A2d 102 (III) (Md. 1992).

Because of our holding that the caps violate the right to trial by jury, we need not address the alternative arguments that the caps violate the separation of powers under Art. I, Sec. II, Par. III of the Georgia Constitution or that they violate the equal protection clause in Art. I, Sec. I, Par. II thereof.

of OCGA § 51-13-1 certainly constitutes a decision on an issue of first impression, given that the caps have been in effect for only five years, see Ga. L. 2005, p. 18, § 15, as well as the considerable litigation over similar caps' constitutionality in other states, see, e.g., cases cited in Division 2, supra, it can hardly be argued that the caps' validity was assured.[9] Compare *Allan v. Allan*, 236 Ga. 199, 207-208 (223 SE2d 445) (1976) (no retroactive application where invalidated statute dealt with "time-honored" process relied on by "generations"); *Federated Mut. Ins. Co. v. DeKalb County*, 176 Ga. App. 70 (335 SE2d 873) (1985) (no retroactive application where unconstitutional ordinance had gone unchallenged for almost 24 years).

Regarding the second factor, clearly, retroactive application would advance the operation of our holding herein, in that an unconstitutional statute will not be given effect even for the brief period between enactment and invalidation. See *City of Atlanta*, supra, 276 Ga. at 453 (4) ("[a]pplying the ruling of unconstitutionality retrospectively will have the effect of undoing th[e] illegal regulation"). Finally, as to the third factor, we do not find that retroactive application will result in substantial inequitable results. Nothing in the record supports appellant's contention that its litigation strategy would have been different had it known that the caps were invalid, especially given that the caps had no impact on the determination of liability and, as they were to be applied only after the jury reached its verdict, would have had no bearing on evidentiary rulings, arguments of counsel, or jury instructions. Compare *Banks v. ICI Americas, Inc.*, 264 Ga. 732 (2) (450 SE2d 671) (1994) (application of new standard of liability would affect evidence presented, objections thereto, trial arguments, and jury instructions); *American Assn. of Cab Cos. v. Parham*, 291 Ga. App. 33 (3) (a), (b) (661 SE2d 161) (2008) (application of new standard of proof necessarily affected jury's assessment of liability). Further, appellant's argument regarding the impact of the damages caps on its strategy as to settlement is simply too speculative to justify deviation from the general rule of retroactivity. We have declined to find substantial inequitable results in cases involving far more compelling instances of hardship. See, e.g., *City of Atlanta*, supra, 276 Ga. at 452-453 (4) (financial hardship imposed by requiring refund of millions of dollars in taxes paid under unconstitutional ordinance did not justify prospective application). Accordingly, we are not inclined

---

[9] Notably, unofficial sources reflect lawmakers' apparent concerns over the potential constitutional infirmities of the caps and other provisions therein. See Hannah Yi Crockett, Rebecca McArthur & Matthew Walker, Peach Sheets, Torts and Civil Practice, 22 Ga. St. U. L. Rev. 221, 233, 236 (2005) (referencing remarks by various lawmakers during floor debates regarding constitutional concerns).

to find substantial inequitable results under the present circumstances, and we hold that the decision herein shall be applied retroactively.[10]

4. We find no abuse of the trial court's discretion in granting appellees' motion to exclude certain evidence, because that ruling was necessitated by the trial court's earlier grant of appellant's motion in limine. See generally *Dyals v. Dyals*, 281 Ga. 894 (3) (644 SE2d 138) (2007) (party cannot complain of alleged error induced by its own conduct). As to appellant's claim that the evidence was relevant to establishing the bias of appellee's expert witness, the record establishes that the trial court's ruling in no manner precluded appellant from attempting to show the witness' bias through cross-examination or other means. Accordingly, this enumeration lacks merit.

For the foregoing reasons, we affirm the judgment of the trial court.

*Judgment affirmed. All the Justices concur, except Melton, J., who concurs in Divisions 1, 2, and 4 and in the judgment, and Carley, P. J., and Hines and Nahmias, JJ., who concur specially.*

NAHMIAS, Justice, concurring specially.

I join all of the majority opinion except for Division 3, regarding retroactive application, in which I concur only in the result.

1. As the Court correctly and unanimously concludes in Division 2 of the majority opinion, OCGA § 51-13-1's flat caps on noneconomic compensatory damages, as found by juries in common-law medical malpractice cases, violate this State's constitutional guarantee that "[t]he right to trial by jury shall remain inviolate." Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a). The General Assembly has broad authority to address the many vexing issues related to health care costs and the availability of health care providers, but the Legislature's discretion is bounded by the fundamental rights enshrined in our Constitution.

2. I join only in the result of Division 3 of the majority opinion. I agree that our holding that OCGA § 51-13-1 is unconstitutional

---

[10] Contrary to appellant's contention, the retroactive application of the court's ruling herein does not entitle it to a new trial with the benefit of the knowledge of that ruling. The cases cited to support this proposition are clearly distinguishable in that, in those cases, a new trial was warranted because the trial court had *erred* by applying the law that was subsequently invalidated. See *Banks*, supra, 264 Ga. at 737 (2) (new trial granted under newly adopted standard of liability for design defect claims); *Parham*, supra, 291 Ga. App. at 38-39 (3) (a), (b) (new trial granted under new standard of proof). Here, by contrast, the trial court correctly invalidated the statute at issue, and thus there is no basis for granting a new trial.

Given our finding of retroactivity, we also reject appellant's challenge to the trial court's award of prejudgment interest under OCGA § 51-12-14.

must be applied "retroactively" in this case. The majority reaches that result only after applying the flexible three-factor test set forth in *Chevron Oil Co. v. Huson*, 404 U. S. 97, 106-107 (92 SC 349, 30 LE2d 296) (1971). See Majority Op. at pp. 738-740. I believe that retroactive application of our decisions cannot be so selective. That is also the *current* position of the United States Supreme Court, which disapproved the *Chevron Oil* test in *Harper v. Virginia Dept. of Taxation*, 509 U. S. 86, 97-98 (113 SC 2510, 125 LE2d 74) (1993).

    *Harper* followed *Griffith v. Kentucky*, 479 U. S. 314 (107 SC 708, 93 LE2d 649) (1987), which overruled the similar multi-factor balancing test for selective retroactivity in the criminal context that had been adopted in *Linkletter v. Walker*, 381 U. S. 618 (85 SC 1731, 14 LE2d 601) (1965). *Griffith*'s holding "rested on two 'basic norms of constitutional adjudication.' " *Harper*, 509 U. S. at 95 (quoting *Griffith*, 479 U. S. at 322).

> First, we reasoned that "the nature of judicial review" strips us of the quintessentially "legislat[ive]" prerogative to make rules of law retroactive or prospective as we see fit. . . . Second, we concluded that "selective application of new rules violates the principle of treating similarly situated [parties] the same."

Id. (quoting *Griffith*, 479 U. S. at 322-323).

    The *Harper* Court explained that these basic principles of judicial adjudication applied to civil cases as well:

> In both civil and criminal cases, we can scarcely permit "the substantive law [to] shift and spring" according to "the particular equities of [individual parties'] claims" of actual reliance on an old rule and of harm from a retroactive application of the new rule. Our approach to retroactivity heeds the admonition that "[t]he Court has no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently."

Id. at 97 (citations omitted). Thus, the current doctrine as to federal law is that, when the U. S. Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." Id.

    I recognize that, with respect to the retroactivity of this Court's decisions on *state* law issues, the federal doctrine is not controlling.

See *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U. S. 358, 364-365 (53 SC 145, 77 LE 360) (1932). But this Court has, at least until recently, followed the U. S. Supreme Court's lead in this area. Thus, this Court adopted the *Chevron Oil* test for retroactivity of civil decisions in *Flewellen v. Atlanta Cas. Co.*, 250 Ga. 709, 712 (300 SE2d 673) (1983). Then, in *Taylor v. State*, 262 Ga. 584 (422 SE2d 430) (1992), this Court endorsed *Griffith*'s rule of non-selective retroactivity for our criminal law decisions, using language that echoed the "basic norms of constitutional adjudication" underlying the holdings in *Griffith* and *Harper*:

> In deciding this issue, we have been strongly influenced by considerations of fairness and the even-handed administration of justice. In order to ensure that similarly situated defendants are treated similarly and to maintain the integrity of the judicial process while still providing finality, we deem it appropriate to adopt the "pipeline" approach, that is, that a new rule of criminal procedure (here, the disapproval of the sequential jury charge on murder and manslaughter) will be applied to all cases then on direct review or not yet final. Accord *Griffith v. Kentucky*, 479 U. S. 314 (107 SC 708, 93 LE2d 649) (1987).

262 Ga. at 586 (footnote omitted).

Foreshadowing the result in *Harper*, which was decided just eight months later, *Taylor*'s footnote 2 added that the rule the Court was endorsing for criminal law decisions "is consistent with the long-standing rule applied in civil cases," which is that

> "a reviewing court should apply the law as it exists at the time of its judgment rather than the law prevailing at the rendition of the judgment under review, and may therefore reverse a judgment that was correct at the time it was rendered . . . where the law has been changed in the meantime and where such application of the new law will impair no vested right under the prior law."

Id. at 586, n. 2 (quoting *City of Valdosta v. Singleton*, 197 Ga. 194, 208 (28 SE2d 759) (1944)).[11]

In 2006, however, without mention of *Griffith* or *Taylor*, this

---

[11] It should be noted that the rule is different where a party is seeking to use a new decision to undermine a *final* judgment, which occurs most commonly in a petition for a writ of habeas corpus — where again this Court's approach follows the doctrine set forth by the United States Supreme Court. See *Harris v. State*, 273 Ga. 608, 610 (543 SE2d 716) (2001) (citing *Teague v. Lane*, 489 U. S. 288 (109 SC 1060, 103 LE2d 334) (1989)).

Court unanimously rejected the U. S. Supreme Court's holding in *Harper* and reaffirmed its endorsement of the "flexible *Chevron Oil* test with regard to the prospectivity of new state law decisions." *Findley v. Findley*, 280 Ga. 454, 458-459 (629 SE2d 222) (2006). After reviewing some of this Court's decisions over the previous three decades and surveying the approach of other state courts after *Harper*, the *Findley* Court concluded that "the juristic philosophy of this State is more consistent with that expressed in *Chevron Oil* than that of . . . *Harper*." 280 Ga. at 460.

If selective retroactivity is in fact the "juristic philosophy of this State," I do not share it, and I do not understand how that philosophy can justify the contrary doctrines for new criminal law decisions under *Taylor* and for new civil law decisions under *Findley*. I instead share the juristic philosophy of the common law, under which "there was no authority for the proposition that judicial decisions made law only for the future" — as the U. S. Supreme Court candidly acknowledged in *Linkletter*, before departing from that tradition and starting courts down the road to today's morass. 381 U. S. at 622 (citing, among other things, 1 Blackstone, Commentaries 69 (15th ed. 1809)). See also *Kuhn v. Fairmont Coal Co.*, 215 U. S. 349, 372 (30 SC 140, 54 LE 228) (1910) (Holmes, J., dissenting) ("Judicial decisions have had retrospective operation for near a thousand years.").

My philosophy is, I believe, also that of Chief Justice John Marshall, who explained that "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U. S. (1 Cranch) 137, 177 (2 LE 60)(1803) — not to say what the law will be, at least for those litigants for whom we think that law is equitable. See also *United States v. Schooner Peggy*, 5 U. S. (1 Cranch) 103, 110 (2 LE 49) (1801) (Marshall, C. J.) (applying on appeal a change in the law pursuant to a treaty ratified after the judgment in the trial court). Indeed, unlike the United States Constitution, the Georgia Constitution expressly provides that "Legislative acts in violation of this Constitution or the Constitution of the United States are void, and the judiciary shall so declare them." Ga. Const. of 1983, Art. I, Sec. II, Par. V. I do not understand how we could declare a legislative act like OCGA § 51-13-1 void, yet still allow that statute to be applied as good law in pending cases. See *American Trucking Assns. v. Smith*, 496 U. S. 167, 201 (110 SC 2323, 110 LE2d 148) (1990) (Scalia, J., concurring in the judgment) ("To hold a governmental Act to be unconstitutional is not to announce that *we* forbid it, but that the *Constitution* forbids it; and when, as in this case, the constitutionality of a state statute is placed in issue, the question is not whether some decision of ours "applies" in the way that a law applies; the question is whether the Constitution, as

interpreted in that decision, invalidates the statute. Since the Constitution does not change from year to year; since it does not conform to our decisions, but our decisions are supposed to conform to it; the notion that our interpretation of the Constitution in a particular decision could take prospective form does not make sense." (emphasis in original)).

It may be argued that the majority is simply adhering to stare decisis in applying the *Chevron Oil* test that this Court adopted in *Flewellen* and re-approved in *Findley*. That argument was advanced by the dissenters in *Harper* as well. See 509 U. S. at 113 (O'Connor, J., dissenting). But as Justice Scalia's concurring opinion in that case demonstrates in detail:

> Prospective decisionmaking is the handmaid of judicial activism, and the born enemy of stare decisis. It was formulated in the heyday of legal realism and promoted as a "techniqu[e] of judicial lawmaking" in general, and more specifically as a means of making it easier to overrule prior precedent. B. Levy, Realist Jurisprudence and Prospective Overruling, 109 U. Pa. L. Rev. 1 (1960). Thus, the dissent is saying, in effect, that stare decisis demands the preservation of methods of destroying stare decisis recently invented in violation of stare decisis.

*Harper*, 509 U. S. at 105-106 (Scalia, J., concurring). Like the U. S. Supreme Court cases disapproved in *Griffith* and *Harper*, our cases endorsing selective retroactivity have no deep roots in our legal tradition, but instead reflect a jurisprudence that " 'came into being' " with *Linkletter* in 1965. *Harper*, 509 U. S. at 106 (Scalia, J., concurring).

If the "juristic philosophy of this State" continues to support selective and flexible retroactive application of our decisions, then I hope that I am in the vanguard of change. I do not agree that the substantive law can "shift and spring" according to the particular equities of individual parties' claims, or that we may disregard current law and treat similarly situated litigants differently. *Harper*, 509 U. S. at 97. I would instead hold that, "[w]hen this Court applies a rule of [state] law to the parties before it," as we do in this case, then "that rule is the controlling interpretation of [state] law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." Id. Because of this view, I respectfully can join only in the result of Division 3 of the majority opinion.

I am authorized to state that Presiding Justice Carley and

Justice Hines join in this special concurrence.

DECIDED MARCH 22, 2010.

*Peters & Monyak, Jonathan C. Peters, Melissa B. Johnson, Carlock, Copeland & Stair, Thomas S. Carlock, Eric J. Frisch*, for appellant.

*Bondurant, Mixson & Elmore, Michael B. Terry, Sarah M. Shalf, Houck, Ilardi & Regas, Frank A. Ilardi, Rosser A. Malone, James D. Summerville*, for appellees.