In the Supreme Court of Georgia

Decided:   September 12, 2016

S16A0691.  HERON LAKE II APARTMENTS, L. P. et al. v. LOWNDES
COUNTY BOARD OF TAX ASSESSORS.

HINES, Presiding Justice.

This is an appeal by the owners of residential rental properties in Lowndes County from a final order of the superior court declaring that OCGA § 48-5-2 (3) (B.1),[1] which excludes low-income housing income tax credits  from consideration for the purpose of assessing ad valorem tax, is unconstitutional as violating the taxation uniformity provision of the Georgia Constitution, Ga. Const. of 1983, Art. VII, Sec. I, Par. III (a) ("taxation uniformity provision").[2]

[1] OCGA § 48-5-2 (3) (B.1) provides:

> The tax assessor shall not consider any income tax credits with respect to real property which are claimed and granted pursuant to either Section 42 of the Internal Revenue Code of 1986, as amended, or Chapter 7 of this title in determining the fair market value of real property.

[2] Ga. Const. of 1983, Art. VII, Sec. I, Par. III provides:

> (a) All taxes shall be levied and collected under general laws and for public purposes only. Except as otherwise provided in subparagraphs (b), (c), (d), (e), and (f) of this Paragraph, all taxation shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax.

(b)(1) Except as otherwise provided in this subparagraph (b), classes of subjects for taxation of property shall consist of tangible property and one or more classes of intangible personal property including money; provided, however, that any taxation of intangible personal property may be repealed by general law without approval in a referendum effective for all taxable years beginning on or after January 1, 1996.

(2) Subject to the conditions and limitations specified by law, each of the following types of property may be classified as a separate class of property for ad valorem property tax purposes and different rates, methods, and assessment dates may be provided for such properties:

(A) Trailers.

(B) Mobile homes other than those mobile homes which qualify the owner of the home for a homestead exemption from ad valorem taxation.

(C) Heavy-duty equipment motor vehicles owned by nonresidents and operated in this state.

(3) Motor vehicles may be classified as a separate class of property for ad valorem property tax purposes, and such class may be divided into separate subclasses for ad valorem purposes. The General Assembly may provide by general law for the ad valorem taxation of motor vehicles including, but not limited to, providing for different rates, methods, assessment dates, and taxpayer liability for such class and for each of its subclasses and need not provide for uniformity of taxation with other classes of property or between or within its subclasses. The General Assembly may also determine what portion of any ad valorem tax on motor vehicles shall be retained by the state. As used in this subparagraph, the term "motor vehicles" means all vehicles which are self-propelled.

(c) Tangible real property, but no more than 2,000 acres of any single property owner, which is devoted to bona fide agricultural purposes shall be assessed for ad valorem taxation purposes at 75 percent of the value which other tangible real property is assessed. No property shall be entitled to receive the preferential assessment provided for in this subparagraph if the property which would otherwise receive such assessment would result in any person who has a beneficial interest in such property, including any interest in the nature of stock ownership, receiving the benefit of such preferential assessment as to more than 2,000 acres. No property shall be entitled to receive the preferential assessment provided for in this subparagraph unless the conditions set out below are met:

(1) The property must be owned by:

(A)(i) One or more natural or naturalized citizens;

(ii) An estate of which the devisee or heirs are one or more natural or naturalized citizens; or

(iii) A trust of which the beneficiaries are one or more natural or naturalized citizens; or

(B) A family-owned farm corporation, the controlling interest of which is

2

owned by individuals related to each other within the fourth degree of civil reckoning, or which is owned by an estate of which the devisee or heirs are one or more natural or naturalized citizens, or which is owned by a trust of which the beneficiaries are one or more natural or naturalized citizens, and such corporation derived 80 percent or more of its gross income from bona fide agricultural pursuits within this state within the year immediately preceding the year in which eligibility is sought.

(2) The General Assembly shall provide by law:

(A) For a definition of the term "bona fide agricultural purposes," but such term shall include timber production;

(B) For additional minimum conditions of eligibility which such properties must meet in order to qualify for the preferential assessment provided for herein, including, but not limited to, the requirement that the owner be required to enter into a covenant with the appropriate taxing authorities to maintain the use of the properties in bona fide agricultural purposes for a period of not less than ten years and for appropriate penalties for the breach of any such covenant.

(3) In addition to the specific conditions set forth in this subparagraph (c), the General Assembly may place further restrictions upon, but may not relax, the conditions of eligibility for the preferential assessment provided for herein.

(d)(1) The General Assembly shall be authorized by general law to establish as a separate class of property for ad valorem tax purposes any tangible real property which is listed in the National Register of Historic Places or in a state historic register authorized by general law. For such purposes, the General Assembly is authorized by general law to establish a program by which certain properties within such class may be assessed for taxes at different rates or valuations in order to encourage the preservation of such historic properties and to assist in the revitalization of historic areas.

(2) The General Assembly shall be authorized by general law to establish as a separate class of property for ad valorem tax purposes any tangible real property on which there have been releases of hazardous waste, constituents, or substances into the environment. For such purposes, the General Assembly is authorized by general law to establish a program by which certain properties within such class may be assessed for taxes at different rates or valuations in order to encourage the cleanup, reuse, and redevelopment of such properties and to assist in the revitalization thereof by encouraging remedial action.

(e) The General Assembly shall provide by general law:

(1) For the definition and methods of assessment and taxation, such methods to include a formula based on current use, annual productivity, and real property sales data, of: "bona fide conservation use property" to include bona fide agricultural and timber land not to exceed 2,000 acres of a single owner; and "bona fide residential transitional property," to include private single-family residential owner occupied property located in transitional developing areas not to exceed five acres of any single owner. Such methods of assessment and taxation shall be subject to the following conditions:

3

(A) A property owner desiring the benefit of such methods of assessment and taxation shall be required to enter into a covenant to continue the property in bona fide conservation use or bona fide residential transitional use; and

(B) A breach of such covenant within ten years shall result in a recapture of the tax savings resulting from such methods of assessment and taxation and may result in other appropriate penalties;

(2) That standing timber shall be assessed only once, and such assessment shall be made following its harvest or sale and on the basis of its fair market value at the time of harvest or sale. Said assessment shall be two and one-half times the assessed percentage of value fixed by law for other real property taxed under the uniformity provisions of subparagraph (a) of this Paragraph but in no event greater than its fair market value; and for a method of temporary supplementation of the property tax digest of any county if the implementation of this method of taxing timber reduces the tax digest by more than 20 percent, such supplemental assessed value to be assigned to the properties otherwise benefiting from such method of taxing timber.

(f)(1) The General Assembly shall provide by general law for the definition and methods of assessment and taxation, such methods to include a formula based on current use, annual productivity, and real property sales data, of "forest land conservation use property" to include only forest land each tract of which exceeds 200 acres of a qualified owner. Such methods of assessment and taxation shall be subject to the following conditions:

(A) A qualified owner shall consist of any individual or individuals or any entity registered to do business in this state;

(B) A qualified owner desiring the benefit of such methods of assessment and taxation shall be required to enter into a covenant to continue the property in forest land use;

(C) All contiguous forest land conservation use property of an owner within a county for which forest land conservation use assessment is sought under this subparagraph shall be in a single covenant;

(D) A breach of such covenant within 15 years shall result in a recapture of the tax savings resulting from such methods of assessment and taxation and may result in other appropriate penalties; and

(E) The General Assembly may provide by general law for a limited exception to the 200 acre requirement in the case of a transfer of ownership of all or a part of the forest land conservation use property during a covenant period to another owner qualified to enter into an original forest land conservation use covenant if the original covenant is continued by both such acquiring owner and the transferor for the remainder of the term, in which event no breach of the covenant shall be deemed to have occurred even if the total size of a tract from which the transfer was made is reduced below 200 acres.

(2) No portion of an otherwise eligible tract of forest land conservation use property shall be entitled to receive simultaneously special assessment and taxation under this subparagraph and either subparagraph (c) or (e) of this Paragraph.

(3)(A) The General Assembly shall appropriate an amount for assistance grants to counties, municipalities, and county and independent school districts to offset revenue loss attributable

For the reasons which follow, we affirm the judgment of the superior court.

The following facts are not in dispute in this appeal.  The properties at

_____

to the implementation of this subparagraph. Such grants shall be made in such manner and shall be subject to such procedures as may be specified by general law.
  (B) If the forest land conservation use property is located in a county, municipality, or county or independent school district where forest land conservation use value causes an ad valorem tax revenue reduction of 3 percent or less due to the implementation of this subparagraph, in each taxable year in which such reduction occurs, the assistance grants to the county, each municipality located therein, and the county or independent school districts located therein shall be in an amount equal to 50 percent of the amount of such reduction.
  (C) If the forest land conservation use property is located in a county, municipality, or county or independent school district where forest land conservation use value causes an ad valorem tax revenue reduction of more than 3 percent due to the implementation of this subparagraph, in each taxable year in which such reduction occurs, the assistance grants to the county, each municipality located therein, and the county or independent school districts located therein shall be as follows:
    (i) For the first 3 percent of such reduction amount, in an amount equal to 50 percent of the amount of such reduction; and
    (ii) For the remainder of such reduction amount, in an amount equal to 100 percent of the amount of such remaining reduction amount.
(4) Such revenue reduction shall be calculated by utilizing forest land fair market value. For purposes of this subparagraph, forest land fair market value means the 2008 fair market value of the forest land. Such 2008 valuation may increase from one taxable year to the next by a rate equal to the percentage change in the price index for gross output of state and local government from the prior year to the current year as defined by the National Income and Product Accounts and determined by the United States Bureau of Economic Analysis and indicated by the Price Index for Government Consumption Expenditures and General Government Gross Output (Table 3.10.4). Such revenue reduction shall be determined by subtracting the aggregate forest land conservation use value of qualified properties from the aggregate forest land fair market value of qualified properties for the applicable tax year and the resulting amount shall be multiplied by the millage rate of the county, municipality, or county or independent school district.
(5) For purposes of this subparagraph, the forest land conservation use value shall not include the value of the standing timber located on forest land conservation use property.
(g) The General Assembly may provide for a different method and time of returns, assessments, payment, and collection of ad valorem taxes of public utilities, but not on a greater assessed percentage of value or at a higher rate of taxation than other properties, except that property provided for in subparagraph (c), (d), (e), or (f) of this Paragraph.

5

issue are eligible to receive federal and state low-income housing income tax credits ("tax credits") pursuant to Section 42 of the Internal Revenue Code of 1986, as amended ("Section 42"), and OCGA § 48-7-29.6.[3]  In exchange for

[3]OCGA § 48-7-29.6 provides:

(a) As used in this Code section, the term:
   (1) "Federal housing tax credit" means the federal tax credit as provided in Section 42 of the Internal Revenue Code of 1986, as amended.
   (2) "Median income" means those incomes that are determined by the federal Department of Housing and Urban Development guidelines and adjusted for family size.
   (3) "Project" means a housing project that has restricted rents that do not exceed 30 percent of median income for at least 40 percent of its units occupied by persons or families having incomes of 60 percent or less of the median income, or at least 20 percent of the units occupied by persons or families having incomes of 50 percent or less of the median income.
   (4) "Qualified basis" means that portion of the tax basis of a qualified Georgia project eligible for the federal housing tax credit, as that term is defined in Section 42 of the Internal Revenue Code of 1986, as amended.
   (5) "Qualified Georgia project" means a qualified low-income building as that term is defined in Section 42 of the Internal Revenue Code of 1986, as amended, that is located in Georgia.
(b)(1) A state tax credit against the tax imposed by this article, to be termed the Georgia housing tax credit, shall be allowed with respect to each qualified Georgia project placed in service after January 1, 2001. The amount of such credit shall, when combined with the total amount of credits authorized under Code Section 33-1-18, in no event exceed an amount equal to the federal housing tax credit allowed with respect to such qualified Georgia project.
   (2)(A) If under Section 42 of the Internal Revenue Code of 1986, as amended, a portion of any federal housing tax credit taken on a project is required to be recaptured as a result of a reduction in the qualified basis of such project, the taxpayer claiming any state tax credit with respect to such project shall also be required to recapture a portion of any state tax credit authorized by this Code section. The state recapture amount shall be equal to the proportion of the state tax credit claimed by the taxpayer that equals the proportion the federal recapture amount bears to the original federal housing tax credit amount subject to recapture. The tax credit under this Code section shall not be subject to recapture if such recapture is due solely to the sale or transfer of any direct or indirect interest in such qualified Georgia project.
      (B) In the event that recapture of any Georgia housing tax credit is required, any

receiving a ten-year award of tax credits, the property owners agreed to lease their rental units to eligible low-income tenants at below-market rents set by the Georgia Department of Community Affairs ("GDCA") for a period of 30 years or more. Income tax credits are claimed in equal amounts for a ten-year period beginning with the taxable year in which a qualified building is placed in service or, if elected by the owner, the succeeding taxable year (the "credit period"). During the credit period, the owner may not sell, transfer, or exchange the property without first requesting GDCA's approval of the proposed sale, transfer, or exchange. The GDCA will not recognize a new owner until all required documentation is submitted and the new owner agrees in writing to

---

amended return submitted to the commissioner as provided in this Code section shall include the proportion of the state tax credit required to be recaptured, the identity of each taxpayer subject to the recapture, and the amount of tax credit previously allocated to such taxpayer.
(3) In no event shall the total amount of the tax credit under this Code section for a taxable year exceed the taxpayer's income tax liability. Any unused tax credit shall be allowed to be carried forward to apply to the taxpayer's next three succeeding years' tax liability. No such tax credit shall be allowed the taxpayer against prior years' tax liability.
(4) The tax credit allowed under this Code section, and any recaptured tax credit, shall be allocated among some or all of the partners, members, or shareholders of the entity owning the project in any manner agreed to by such persons, whether or not such persons are allocated or allowed any portion of the federal housing tax credit with respect to the project.
(c) The commissioner and the state department designated by the Governor as the state housing credit agency for purposes of Section 42(h) of the Internal Revenue Code of 1986, as amended, shall each be authorized to promulgate any rules and regulations necessary to implement and administer this Code section.

assume the requirements and restrictions set forth in covenants applicable for low-income housing tax credits, Section 42, and corresponding federal regulations. After being awarded state and federal income tax credits by the GDCA, the property owners in this case "sold" the tax credits to investors in that they allowed investors to purchase limited partnership interests. The tax credits would "flow through" the partnerships to the limited partners, who would then use the tax credits to reduce their individual income tax liabilities.

On March 25, 2015, the Lowndes County Board of Tax Assessors (the "Assessors") filed in the Superior Court of Lowndes County a petition for declaratory judgment as to the constitutionality of OCGA § 48-5-2 (3) (B.1), which precluded the Assessors from considering the tax credits in determining the fair market value of the real property at issue, as of January 1, 2015. As noted, the superior court declared OCGA § 48-5-2 (3) (B.1) to be unconstitutional as running afoul of the taxation uniformity provision, and affected property owners have filed the present appeal from the adverse ruling.

Again, OCGA § 48-5-2 (3) (B. l) prohibits the tax assessor from

considering tax credits in determining the fair market value of real property.[4]

Yet, OCGA § 48-5-2 (3) (B) (vi),[5] as amended in 2014, provides, in determining the fair market value of real property, that the tax assessor is to apply rental limitations, operational requirements, and other restrictions imposed on a property in connection with the property being eligible for any income tax

_____

[4]OCGA § 48-5-2 (3) provides:

"Fair market value of property" means the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale. The income approach, if data is available, shall be considered in determining the fair market value of income-producing property. Notwithstanding any other provision of this chapter to the contrary, the transaction amount of the most recent arm's length, bona fide sale in any year shall be the maximum allowable fair market value for the next taxable year. With respect to the valuation of equipment, machinery, and fixtures when no ready market exists for the sale of the equipment, machinery, and fixtures, fair market value may be determined by resorting to any reasonable, relevant, and useful information available, including, but not limited to, the original cost of the property, any depreciation or obsolescence, and any increase in value by reason of inflation. Each tax assessor shall have access to any public records of the taxpayer for the purpose of discovering such information.

[5]OCGA § 48-5-2 (3) (B) (vi) states in full that in determining the fair market value of real property, the tax assessor shall apply:

(vi) Rent limitations, operational requirements, and any other restrictions imposed upon the property in connection with the property being eligible for any income tax credits described in subparagraph (B.1) of this paragraph or receiving any other state or federal subsidies provided with respect to the use of the property as residential rental property; provided, however, that such properties described in subparagraph (B.1) of this paragraph shall not be considered comparable real property for assessment or appeal of assessment of other properties[.]

9

credits described in OCGA § 48-5-2 (3) (B. l).  Consequently, as the superior

court stated, the issue is whether, given OCGA § 48-5-2 (3) (B) (vi), as amended

in 2014, OCGA § 48-5-2 (3) (B.1) violates the uniformity requirement of Ga.

Const. of 1983, Art. VII, Sec. I, Par. III (a).        The constitutionality of a statute

presents a question  of law, and this Court's review of a trial court's holding

regarding the constitutionality of a statute is de novo.  *Atlanta Oculoplastic*

*Surgery, P.C. v. Nestlehutt*, 286 Ga. 731, 732-733 (2) (691 SE2d 218) (2010).

By its express terms, the taxation uniformity provision of the Georgia

Constitution mandates that property of the same class be assessed and taxed

uniformly.  Paragraph III (b) of the taxation uniformity provision states that,

with specified limited exceptions, "the classes of subjects for the taxation of

property shall consist of tangible property and one or more classes of intangible

personal property. . . ."  See n. 2 supra.

> The Constitution creates "tangible property" as a single class of
> property. See Art. VII, Sec. I, Par. III(b). "Tangible property"
> includes real and personal property, and the General Assembly has
> no authority to establish different classes or subclasses of tangible
> property other than as fixed by the [Constitution]. The types of
> tangible property that may be separately classified and subclassified
> by the General Assembly under the [taxation uniformity provision]
> are listed in subsection (b) of Article VII, Section I, Paragraph III

10

*Blevins v. Dade Cty. Bd. of Tax Assessors*, 288 Ga. 113, 114 (1) (702 SE2d 145) (2010). Neither Section 42 real property nor tax credits are part of this limited list of express exceptions. However, the property owners urge that this is of no moment because the tax credits are intangible personal property, and therefore, can be assessed differently from real property without violating the uniformity requirement. Thus, the threshold inquiry is the relationship of the tax credits to the tangible property at issue, that is their appropriate classification, for the purpose of ad valorem taxation.

> OCGA § 48-5-3 mandates that,
>
> [a]ll real property including, but not limited to, leaseholds, interests less than fee, and all personal property shall be liable to taxation and shall be taxed, except as otherwise provided by law. Liability of property for taxation shall not be affected by the individual or corporate character of the property owner or by the resident or nonresident status of the property owner.

The appraisal of real property for tax purposes is subject to regulation. Indeed, the Georgia Department of Revenue has adopted regulations, which have been compiled in an "Appraisal Procedures Manual" ("APM"), to guide county tax officials in appraising real property. See Ga. Comp. R. & Regs. r.

560-11-10-.01.[6] "The APM defines 'real property' as 'the bundle of rights, interest and benefits connected with the ownership of real estate.'" *Morton v. Glynn Cty. Bd. of Tax Assessors*, 294 Ga. App. 901, 904 (1) (670 SE2d 528) (2008); Ga. Comp. R. & Regs. r. 560-11-10-.02 (1) (x). "'Real estate' means the physical parcel of land, improvements to the land, improvements attached

---

[6]Ga. Comp. R. & Regs. r. 560-11-10-.01provides:

(1) Purpose. This appraisal procedures manual has been developed in accordance with Code section 48-5-269.1 which directs the Revenue Commissioner to adopt by rule, subject to Chapter 13 of Title 50, the "Georgia Administrative Procedure Act,"and maintain an appropriate procedural manual for use by the county property appraisal staff in appraising tangible real and personal property for ad valorem tax purposes.
(2) Specific procedures. In order to facilitate the mass appraisal process, specific procedures are provided within this Chapter which are designed to arrive at a basic appraisal value of real and personal property. These specific procedures are designed to provide fair market value under normal circumstances. When unusual circumstances are affecting value, they should be considered. In all instances, the appraisal staff will apply Georgia law and generally accepted appraisal practices to the basic appraisal values required by this manual and make any further valuation adjustments necessary to arrive at the fair market values.
(3) Board of tax assessors. The county board of tax assessors shall require the appraisal staff to observe the procedures in this manual when performing their appraisals. The county board of tax assessors may not adopt local procedures that are in conflict with Georgia law or the procedures required by this manual. The county board of tax assessors must consider the appraisal staff information in the performance of their duties. In each instance, however, the assessment placed on each parcel of property shall be the assessment established by the county board of tax assessors as provided in Code section 48-5-306.
(4) Other appraisal procedures. The appraisal staff may use those generally accepted appraisal practices set forth in the Uniform Standards of Professional Appraisal Practice, published by the Appraisal Foundation, and the standards published by the International Association of Assessing Officers, as they may be amended from time to time, to the extent such practices do not conflict with this manual and Georgia law.

to the land, real fixtures and appurtenances such as easements." Ga. Comp. R. & Regs. r. 560-11-10-.02 (1) (v).  Also, OCGA § 44-1-2 (a) defines "real estate" to be:

> (1) All lands and the buildings thereon;
> (2) All things permanently attached to land or to the buildings thereon; and
> (3) Any interest existing in, issuing out of, or dependent upon land or the buildings thereon.

As is evident, the very existence of tax credits is inextricably bound with the ownership of real estate.  As the Court of Appeals concluded in *Pine Pointe Housing, L.P. V. Lowndes County Board of Tax Assessors*, 254 Ga. App. 197 (561 SE2d 860) (2002), "Section 42 tax credits provide a . . . stream of value tied solely to the property.*"*  Id. at 200 (1) (b).  Although the Court of Appeals determined that it was inappropriate to retroactively apply OCGA § 48-5-2 (3) (B.1) to the underlying controversy in  *Pine Pointe Housing,* much of the analysis in the case in regard to ad valorem tax valuation is apposite here.

In 1996, Pine Pointe Housing, a limited partnership, constructed a 71- unit rental housing project in Valdosta, and the property received an allocation of tax credits. As in the present case, the limited partnership permitted the tax credits

to "flow through" to the tax benefit of its limited partners. Pine Pointe appealed the 1997 ad valorem tax assessment of the property to the Lowndes County Board of Equalization, and the Lowndes County Board of Tax Assessors then appealed the ruling of the board of equalization to the superior court, which held a de novo hearing in the matter in November 2000. The issue was the fair market value of the property as of January 1, 1997, and, specifically how to value the property for ad valorem tax purposes given the applicable rental restrictions and federal income tax benefits. On November 30, 2000, the superior court issued its order establishing the fair market value of the property; in doing so, the superior court concluded that the mortgage equity or debt equity income approach to valuation was valid and applicable to the property and that in determining fair market value, it had to consider, inter alia, restrictive covenants of record and the associated tax credits. Pine Pointe appealed, contending, among other things, that the superior court erred in considering the tax credits in determining fair market value. The Court of Appeals disagreed, rejecting Pine Pointe's arguments that the tax credits had, in economic effect, been sold, and thus had no value to Pine Pointe; that consideration of the tax credits was inconsistent with the APM; that the tax credits could not be

14

considered income for accounting purposes; that the superior court's ruling was inconsistent with principles established by case law; and that OCGA § 48-5-2 (3) (B.1), which was effective as of July 1, 2001, prohibited consideration of the tax credits.

As the Court of Appeals explained, generally real property is taxed according to its fair market value, and the General Assembly has defined fair market value as "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." OCGA § 48-5-2 (3), supra at n. 4. The Court explained that OCGA § 48-5-2 (3) (B) set forth the factors which had to be considered in determining fair market value, which factors include any restrictions or limitations on the use of the property resulting from state or federal law, rules or regulations, and any other factors pertinent to the fair market value; in such determination, the taxing authorities are required to apply external factors, such as zoning, deed restrictions, and other pertinent factors, which would by their very nature, include tax credits. The Court of Appeals elaborated,

> The credits have value to a taxpayer with federal income tax liability and can be "passed through" a partnership structure to those taxpayers. Because Section 42 tax credits are generated by a

15

designated property, a third party would pay for the value as part of that property's sale price in a bona fide, arm's length transaction. Furthermore, the tax credits go hand in hand with restrictive covenants that require the property to charge below-market rent. By statute, these restrictions are required to be considered by the assessor. If viewed in isolation, the rental restrictions would artificially depress the value of the property for tax valuation purposes.

*Pine Pointe Housing,* supra at 198 (1).

The tax credits are a benefit connected to the real estate itself, rather than to any individual or entity. Indeed, "if a property eligible for Section 42 tax credits is sold, then the subsequent owner of the property is entitled to the future tax credits associated with the property." Id. at 199 (1) (a); 26 U.S.C.A. § 42 (d) (7) (A) (ii).[7] And,

a future owner could choose to act in a way that would eliminate the [Section 42] credit, but it does not change the law that any tax credit generated is associated with the property nor the evidence that an available tax credit has value to a third-party purchaser. Furthermore, the Internal Revenue Code has provisions which encourage a buyer and seller of property generating Section 42 tax credits to ensure the property continues to be operated as a

---

[7]26 U.S.C.A. § 42 (d) (7) (A) (ii) provides:

[T]he credit allowable by reason of subsection (a) to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable under subsection (a) for such period to the prior owner referred to in subparagraph (B) had such owner not disposed of the building.

low-income rental project.

*Pine Pointe Housing*., supra at 199-200 (1) (a); 26 USCA § 42 (d) (7).

Furthermore, the fact that the tax credits are by statute expressly linked to a "qualified low-income building" and not the underlying land itself does not alter this tie. See 26 U.S.C.A. § 42 (a).[8] Indeed, a building by statutory definition is "real estate."  See OCGA § 44-1-2 (a), supra.

As for the argument that consideration of the tax credits for the purpose of property valuation and assessment would run afoul of the provision in the APM that real property excludes intangible benefits associated with the ownership of real estate, such as business goodwill, it is without merit.[9] The fact that tax credits can be transferred independently from the ownership of the

___

[8]26 U.S.C.A. § 42 (a) provides:

In general.--For purposes of section 38, the amount of the low-income housing credit determined under this section for any taxable year in the credit period shall be an amount equal to--
(1) the applicable percentage of
(2) the qualified basis of each qualified low-income building.

[9]Ga. Comp. R. & Regs. r. 560–11–10–.02 (1) (x) provides:

Real property. "Real property" means the bundle of rights, interests, and benefits connected with the ownership of real estate. Real property does not include the intangible benefits associated with the ownership of real estate, such as the goodwill of a going business concern.

17

associated real property does not render them "intangible personal property" for the purpose of valuation for taxation. Again, the APM expressly includes in the definition of real property the "bundle of rights, interests, and benefits connected with the ownership of real estate." Ga. Comp. R. & Regs. r. 560–11–10–.02 (1) (x). Furthermore,

> Section 42 tax credits are not the type of benefit associated with owning real estate, such as goodwill, that cannot be taken into account in determining the value of a property to a third party. Goodwill is a favor which the management of a business wins from the public, and as such is more associated with a business operation than the property on which the business is located.

*Pine Pointe Housing*., supra at 200 (1) (b) (Internal quotation marks omitted.).

Even if tax credits, considered artificially in isolation, are intangible in nature, they, in fact, do not exist in isolation - they are wholly dependant upon and are not viable apart from the real estate giving rise to them. As noted, the tax credits are an item of value "tied solely to the property." Id. Thus, they are part and parcel of the tangible real estate and "may properly contribute to an assessment of fair market value." *Morton v. Glynn Cty. Bd. of Tax Assessors*, supra at 906 (1). Indeed, to conclude otherwise would bar from consideration a property right which plainly affects the amount a knowledgeable buyer would pay and a

willing seller would accept in a sale, thus, effectively nullifying the statutory definition of fair market value.  See  OCGA § 48-5-2 (3), supra at n. 4.

Simply, inasmuch as OCGA § 48-5-2 (3) (B.1) exempts these income tax credits from consideration in determining the fair market value of the properties at issue, the statute grants preferential treatment for ad valorem taxation purposes and creates a subclass of tangible property other than as permitted by the State Constitution.  See Ga. Const. of 1983, Art. VII, Sec. I, Par. III (b), supra at n. 2.  This runs afoul of the taxation uniformity provision.[10]  *Blevins v. Dade County Bd. of Tax Assessors*, supra at 114 (1).  Consequently, the judgment of the superior court stands.

Judgment affirmed.  All the Justices concur.

---

[10]That OCGA § 48-5-2 (3) (B.1) violates the taxation uniformity provision was implicitly recognized by the General Assembly when it proposed the following 2002 amendment to the Georgia Constitution that would have authorized an exception to the uniformity requirement of  Ga. Const. of 1983, Art. VII, Sec. I, Par. III (a) for Section 42 properties:

"Shall the Constitution be amended so as to provide that qualified low-income building projects may be classified as a separate class of property for ad valorem property tax purposes and different rates, methods, and assessment dates may be provided for such building projects? "

The proposed constitutional amendment was rejected by voters in the November 2002 general election.