306 Ga. 816
FINAL COPY

S19A0975. HERON LAKE II APARTMENTS, LP et al. v.
LOWNDES COUNTY BOARD OF TAX ASSESSORS.

BOGGS, Justice.

This is the second appearance before this Court of the dispute between appellee Lowndes County Board of Tax Assessors ("the Board") and eight partnerships which built and now operate affordable housing apartment complexes ("Section 42 properties") in Lowndes County (collectively, "Appellants"), with the help of federal and state Low Income Housing Tax Credits ("LIHTCs" or "Section 42 Tax Credits"), in connection with which they executed Land Use Restrictive Covenants. See 26 USC § 42.[1] The dispute before us turns on the valuation of these tax credits when calculating ad valorem real property taxes.

---

[1] Section 42 of the Internal Revenue Code allows property owners to agree to rent to low-income tenants for below-market rates in exchange for the right to claim federal income tax credits each year for ten years. The amount of the tax credit awarded is a percentage of the qualified basis of each qualifying low-income building. See 26 USC §§ 38 (b) (1), 42 (a) (1), (2).

As explained below, we conclude that the trial court had subject matter jurisdiction to decide this case, and that LIHTCs do not constitute "actual income" for purposes of OCGA § 48-5-2 (3) (B) (vii) (II). Moreover, OCGA § 48-5-2 (3) (B) (vii) (I) and (II) do not run afoul of the Georgia Constitution's taxation uniformity provision. See Ga. Const. of 1983, Art. VII, Sec. I, Par. III (a).[2] Accordingly, we reverse the judgment of the trial court.

1. OCGA § 48-5-2 (3) defines the phrase "[f]air market value of property" for purposes of ad valorem real property taxation as "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." The statute then specifies when certain approaches to valuation are to be used and certain criteria that must or may be used in making the valuation. See OCGA § 48-5-2 (3) (B). The General Assembly has repeatedly revised OCGA § 48-5-2 (3), and, in

---

[2] "All taxes shall be levied and collected under general laws and for public purposes only. Except as otherwise provided in subparagraphs (b), (c), (d), (e), and (f) of this Paragraph, all taxation shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax."

2001, amended it by adding subparagraph (B.1), which provides as follows:

> The tax assessor *shall not consider any income tax credits with respect to real property which are claimed and granted pursuant to either Section 42 of the Internal Revenue Code of 1986*, as amended, or Chapter 7 of this title in determining the fair market value of real property.

Ga. L. 2001, p. 1098, § 1 (emphasis supplied).[3] That was the genesis of the dispute between the Board and Appellants.

(a)   *The Prior Litigation*

In 2015, the Board filed a declaratory judgment action in Lowndes County Superior Court challenging the 2001 amendment, and the trial court entered an order finding that subsection (B.1) was unconstitutional because it violated the taxation uniformity provision of the Georgia Constitution. This Court affirmed that order in *Heron Lake II Apts. v. Lowndes County Bd. of Tax Assessors*,

---

[3] As discussed below, in *Heron Lake II Apts. v. Lowndes County Bd. of Tax Assessors*, 299 Ga. 598, 610 (791 SE2d 77) (2016), we held OCGA § 48-5-2 (3) (B.1) unconstitutional for violating the Georgia Constitution's taxation uniformity provision. And even though the General Assembly amended OCGA § 48-5-2 (3) in both 2017 and 2019, subsection (B.1) still appears in the Georgia Code.

299 Ga. 598 (791 SE2d 77) (2016) (hereinafter "*Heron Lake I*"), addressing the underlying statutory and policy issues in detail. See id. at 610. The opinion began by noting OCGA § 48-5-3's mandate that "[a]ll real property . . . shall be liable to taxation" and considered the status of the LIHTCs as part of "the bundle of rights, interest and benefits connected with the ownership of real estate" in the Georgia Department of Revenue's Appraisal Procedures Manual, which is written to "guide county tax officials." Id. at 605-606 (citation and punctuation omitted). See Ga. Comp. R. & Regs. r. 560-11-10-.02 (1) (x). After reviewing the Court of Appeals' analysis of subsection (B.1) in *Pine Pointe Housing v. Lowndes County Bd. of Tax Assessors*, 254 Ga. App. 197 (561 SE2d 860) (2002), and noting the General Assembly's unsuccessful attempt in 2002 to amend the Georgia Constitution to permit the classification of qualified low-income building projects as a separate class of property for ad valorem property tax purposes, this Court concluded that the LIHTCs "are a benefit connected to the real estate itself," that the tax credits are not "intangible personal property" because of their

4

dependence on the real estate giving rise to them, and that excluding them from the assessment of fair market value "grants preferential treatment for ad valorem taxation purposes and creates a subclass of tangible property other than as permitted by the State Constitution," which "runs afoul of the taxation uniformity provision." *Heron Lake I*, 299 Ga. at 608-610.

(b) *The Current Litigation*

In 2017, the General Assembly further amended OCGA § 48-5-2 (3). See Ga. L. 2017, p. 55, § 1. The amendment changed the second sentence of paragraph (3) to mandate the consideration of data provided by the property owner, and added a new division (vii) to subparagraph (B). The new OCGA § 48-5-2 (3) (B) (vii) is further subdivided, and says, with emphasis supplied:

> (I) In establishing the value of any property subject to rent restrictions under *the sales comparison approach*, any income tax credits described in division (vi) of this subparagraph that are attributable to a property may be considered in determining the fair market value of the property, provided that the tax assessor uses comparable sales of property which, at the time of the comparable sale, had unused income tax credits that were transferred in an arm's length, bona fide sale.

5

(II) In establishing the value of any property subject to rent restrictions under *the income approach*, any income tax credits described in division (vi) of this subparagraph that are attributable to property may be considered in determining the fair market value of the property, provided that such income tax credits generate actual income to the record holder of title to the property. . . .

Moreover, the 2017 amendment rewrote OCGA § 48-5-2 (3) (B) (vi) to provide that in determining the fair market value of Section 42 properties, tax assessors shall apply, among other things, the following criterion:

Rent limitations, higher operating costs resulting from regulatory requirements imposed on the property, and any other restrictions imposed upon the property in connection with the property being eligible for any income tax credits with respect to real property which are claimed and granted pursuant to either Section 42 of the Internal Revenue Code of 1986, as amended, or Chapter 7 of this title or receiving any other state or federal subsidies provided with respect to the use of the property as residential rental property; provided, however, that properties described in this division shall not be considered comparable real property for the assessment or appeal of assessment of properties not covered by this division. . . .[4]

---

[4] Former OCGA § 48-5-2 (3) (B) (vi) said:
Rent limitations, operational requirements, and any other

6

Finally, the amendment redesignated former OCGA § 48-5-2 (3) (B) (vii) as OCGA § 48-5-2 (3) (B) (viii), and that provision says that in determining the fair market value of real property, tax assessors shall also consider "[a]ny other existing factors provided by law or by rule and regulation of the commissioner [of revenue] deemed pertinent in arriving at fair market value."

In the past, the Board has appraised appellants' state and federal tax credits using the income approach appraisal method. According to the Board, after the 2017 amendment passed, this approach was no longer viable, so it filed a new declaratory

restrictions imposed upon the property in connection with the property being eligible for any income tax credits described in subparagraph (B.1) of this paragraph or receiving any other state or federal subsidies provided with respect to the use of the property as residential rental property; provided, however, that such properties described in subparagraph (B.1) of this paragraph shall not be considered comparable real property for assessment or appeal of assessment of other properties[.]

Subparagraph (B.1) states the same thing regarding Section 42 and Chapter 7, so this change did not substantively alter the underlying law; it only eliminates the need to refer to (B.1) — the provision we held unconstitutional in *Heron Lake I* — for further instruction. Moreover, in Ga. L. 2017, p. 774, § 48, the General Assembly revised language in paragraph (3) as part of a modernization effort, but these changes are not relevant here.

7

judgment action seeking a ruling that the 2017 amendment was unconstitutional for violating the Georgia Constitution's taxation uniformity provision. The Board also asked the trial court to interpret the 2017 amendment to allow LIHTCs to continue to be treated as regular income.

In a November 9, 2018 Final Order, the trial court cited *Heron Lake I* and *Pine Pointe* and declared OCGA § 48-5-2 (3) (B) (vii) (I), which addresses the sales comparison approach, unconstitutional for violating the taxation uniformity provision. The trial court also held that LIHTCs could be considered "actual income" under OCGA § 48-5-2 (3) (B) (vii) (II)'s income approach and, alternatively, that OCGA §48-5-2 (3) (B) (vii) (II) would violate our Constitution's taxation uniformity provision if it were read to exempt LIHTCs from being considered as "actual income."

On appeal, Appellants raise the following three enumerations of error: (1) the trial court lacked jurisdiction over the Board's petition because, when the Board filed suit, it had not yet assessed the Appellants' properties for the 2018 tax year; (2) the trial court

8

erred in finding that LIHTCs were "actual income" rather than offsets against tax liability; and (3) the trial court erred in declaring OCGA § 48-5-2 (3) (B) (vii) (I) and (II) unconstitutional, given the General Assembly's power to forbid the use of improper appraisal methods. Appellants argue that the valuation methodology the Board used — the income approach, counting LIHTCs as "actual income" — substantially inflated their tax assessments and, by negating the intended benefit of LIHTCs, will significantly reduce the availability of affordable housing in Georgia.

2. Appellants contend that the trial court lacked subject matter jurisdiction to consider this case, because when the Board filed suit in 2017, it had not yet assessed taxes on the appellants' properties for tax year 2018. We disagree.

"It is a settled principle of Georgia law that the jurisdiction of the courts is confined to justiciable controversies, and the courts may not properly render advisory opinions." *Fulton County v. City of Atlanta*, 299 Ga. 676, 677 (791 SE2d 821) (2016). A controversy is justiciable "when it is definite and concrete, rather than being

9

hypothetical, abstract, academic, or moot." Id. (citation and punctuation omitted).

Pursuant to the Declaratory Judgment Act, OCGA § 9-4-1 et seq., "[i]n cases of actual controversy," and "in any civil case in which . . . the ends of justice [so] require," Georgia's superior courts "have power . . . to declare rights and other legal relations of any interested party petitioning for" such a declaration. OCGA § 9-4-2 (a), (b). "To state a claim for declaratory judgment, a party need only allege the existence of a justiciable controversy in which future conduct depends on resolution of uncertain legal relations." *City of Atlanta v. Hotels.com*, 285 Ga. 231, 234 (674 SE2d 898) (2009) (holding that City stated viable claim for declaratory relief as to applicability of hotel tax ordinance). "The purpose of the Declaratory Judgment Act is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; the Act is to be liberally construed and administered." Id. (citation and punctuation omitted).

In this case, the trial court had jurisdiction over the Board's

10

petition for declaratory relief. As the Board's petition demonstrates, the parties in this case have an actual, justiciable controversy: namely, whether and how the Board can, under the 2017 amendment, consider the LIHTCs awarded to Appellants when carrying out its mandatory duty to assess ad valorem property taxes on Appellants' low-income housing developments for tax year 2018. That legal question, which is similar to the one the parties litigated to this Court in *Heron Lake I*, has created substantial uncertainty with respect to the parties' legal rights and legal relations. See OCGA §§ 9-4-1; 9-4-2. Accordingly, the trial court had jurisdiction to rule on the Board's petition pursuant to the Declaratory Judgment Act.

3. Appellants also claim that the trial court erred in concluding that Section 42 Tax Credits constitute "actual income" under OCGA § 48-5-2 (3) (B) (vii) (II)'s income approach, because those credits merely offset Section 42 property owners and investors' individual tax liability. We agree.

To recap the statutory scheme at issue here, OCGA § 48-5-6

mandates that, subject to certain exceptions not at issue here, all taxable real property "shall be returned for taxation at its fair market value." OCGA § 48-5-2 (3) defines "fair market value" and provides a list of several criteria that tax assessors "shall apply . . . in determining the fair market value of property." As relevant here, OCGA § 48-5-2 (3) (B) (vi) requires tax assessors to consider "[r]ent limitations . . . and any other restrictions imposed upon the property in connection with the property being eligible for" Section 42 Tax Credits.

In the wake of our decision in *Heron Lake I*, the General Assembly added OCGA § 48-5-2 (3) (B) (vii) (I) and (II), which tell tax assessors how they can use the sales comparison and income approaches in determining the fair market value of Section 42 properties. OCGA § 48-5-2 (3) (B) (vii) (II) provides that, when establishing the fair market value of Section 42 properties under the income approach, tax assessors may consider LIHTCs attributable to those properties, "provided that" the LIHTCs "generate actual income to the record holder of title. . . ."

For starters, in deciding whether the trial court erred in concluding that LIHTCs can be counted as "actual income" under OCGA § 48-5-2 (3) (B) (vii) (II)'s income approach, "we first look to the text . . . [a]nd because we presume that the General Assembly meant what it said and said what it meant when it comes to the meaning of statutes," we "must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 562 (1) (826 SE2d 116) (2019) (citations and punctuation omitted).

Here, a plain text reading of OCGA § 48-5-2 (3) (B) (vii) (II) demonstrates that the trial court failed to construe the statutory phrase "actual income" in the "most natural and reasonable way," because LIHTCs do not provide recipients of those credits with "actual income." *Loudermilk*, supra. Rather, when claimed by an investor or owner of an interest in a Section 42 property, LIHTCs merely reduce that person's overall tax burden. *Heron Lake I*, 299 Ga. at 603. Thus, by claiming these tax credits, investors do not *receive* more money from anyone; they merely *pay* less in taxes to

13

the government. See id. (noting that LIHTCs "'flow through' the partnerships to the limited partners, who would then use the tax credits to reduce their individual income tax liabilities"). Cf. *Gaddy v. Ga. Dept. of Revenue*, 301 Ga. 552, 559 (1) (a) (ii) (802 SE2d 225) (2017) (holding that "[w]hen the state refunds money for overpayment of taxes" to taxpayer claiming private school tax credits, state is not remitting public funds but is "returning the taxpayer's own money"). As such, we decline to read OCGA § 48-5-2 (3) (B) (vii) (II)'s phrase "actual income" to include LIHTCs, because they merely reduce investors' individual tax liabilities.[5]

Our conclusion that LIHTCs do not constitute "actual income" for the purpose of OCGA § 48-5-2 (3) (B) (vii) (II) is consistent with the persuasive reasoning of the United States Supreme Court's decision in *Randall v. Loftsgaarden*, 478 U. S. 647 (106 SCt 3143, 92 LE2d 525) (1986), and the function of the particular tax credits at

---

[5] Although we have previously stated that these tax credits "are an item of value" with respect to the fair market value of Section 42 properties, see *Heron Lake I*, 299 Ga. at 609, we did not hold in that case that they constitute "actual income." The concepts of fair market value of property and income earned from property are not equivalent.

14

issue in this case. In *Randall*, the Court considered whether federal tax benefits received by owners of certain securities could be considered "income" under securities laws. The Court concluded that a security owner's receipt of federal tax benefits, in the form of tax deductions and tax credits, did not constitute "income" under "any reasonable definition." Id. at 656 (II). The Court explained that the tax deductions and tax credits

> have no value in themselves; the economic benefit to the investor — the true "tax benefit" — arises because the investor may offset tax deductions *against* income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income.

Id. at 657 (II) (emphasis in original). Accordingly, the Court rejected the argument "that the tax deductions petitioners were entitled to take by virtue of their partnership interests constitut[ed] income or profits." Id. (citation and punctuation omitted).

As we stated in *Heron Lake I*, Section 42 properties

> are eligible to receive federal and state low-income housing income tax credits . . . pursuant to Section 42 of the Internal Revenue Code of 1986, as amended . . . and OCGA § 48-7-29.6. In exchange for receiving a ten-year award of tax credits, the property owners agreed to lease

15

their rental units to eligible low-income tenants at below-market rents set by the Georgia Department of Community Affairs ("GDCA") for a period of thirty years or more. Income tax credits are claimed in equal amounts for a ten-year period beginning with the taxable year in which a qualified building is placed in service or, if elected by the owner, the succeeding taxable year (the "credit period"). During the credit period, the owner may not sell, transfer, or exchange the property without first requesting GDCA's approval of the proposed sale, transfer, or exchange. The GDCA will not recognize a new owner until all required documentation is submitted and the new owner agrees in writing to assume the requirements and restrictions set forth in covenants applicable for low-income housing tax credits, Section 42, and corresponding federal regulations. After being awarded state and federal income tax credits by the GDCA, the property owners in this case "sold" the tax credits to investors in that they allowed investors to purchase limited partnership interests. The tax credits would "flow through" the partnerships to the limited partners, who would then use the tax credits to reduce their individual income tax liabilities.

*Heron Lake I*, 299 Ga. at 600-603 (footnote omitted).

Here, as in *Randall*, although the tax credits at issue do benefit investors by allowing them to reduce their tax liabilities, they do not constitute "income" for those individuals. *Randall*, 478 U. S. at 656-657 (II). Rather, the tax credits operate to reduce the taxes otherwise payable on account of income an investor receives from

16

other sources, thereby reducing the investor's overall income tax burden.

In short, contrary to the Board's contention and the trial court's ruling, we can see no reasonable way in which to construe the phrase "actual income" in OCGA § 48-5-2 (3) (B) (vii) (II) to include LIHTCs. The financial benefit realized by an owner of a property interest in a Section 42 property is a reduction in his or her overall tax liability — i.e., a tax credit. That benefit does not constitute "actual income" under OCGA § 48-5-2 (3) (B) (vii) (II).[6] Accordingly, we reverse the trial court's conclusion to the contrary.

4. Appellants assert that the trial court erred in declaring both OCGA § 48-5-2 (3) (B) (vii) (I) and (II) unconstitutional, because, in passing the 2017 amendment, the General Assembly appropriately exercised its authority to limit the use of improper appraisal methods, and neither provision precludes tax assessors from

---

[6] Courts in other states agree. See, e.g., *Cottonwood Affordable Housing v. Yavapai County*, 72 P3d 357, 359 (Ariz. Tax Ct. 2003) (stating that LIHTCs "are not income flowing from the rental of the property"); *Stillwater Housing Assoc. v. Rose*, 254 P3d 726, 728 (Okla. Ct. Civ. App. 2011) (holding that LIHTCs are not income and do not replace income).

17

considering LIHTCs when calculating the fair market value of Section 42 properties. We agree.

As noted above, the taxation uniformity provision of the Georgia Constitution mandates that all property of the same class be assessed and taxed uniformly. See Ga. Const. of 1983, Art. VII, Sec. I, Par. III (a). The Georgia Constitution directs the General Assembly to provide, by general law, "methods of assessment and taxation." Ga. Const. of 1983, Art. VII, Sec. I, Par. III (e) (1). The General Assembly has passed legislation which provides that, subject to some exceptions not at issue in this case, all property subject to ad valorem taxation in Georgia "shall be returned for taxation at its fair market value. . . ." OCGA § 48-5-6.[7] And as discussed above, in the 2017 amendment to OCGA § 48-5-2 (3) (B), the General Assembly defined the contours of at least two approaches that assessors may use to establish the fair market

---

[7] OCGA § 48-5-2 (3) defines the "fair market value of property" as "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale," and says that "[t]he income approach, if data are available, shall be utilized in determining the fair market value of income-producing property . . . ."

18

value of Section 42 properties: the sales comparison approach, see OCGA § 48-5-2 (3) (B) (vii) (I), and the income approach, see OCGA § 48-5-2 (3) (B) (vii) (II). See Ga. L. 2017, p. 55 § 1.

We held in *Heron Lake I* that the General Assembly may not, for the purposes of assessing ad valorem real property taxes on Section 42 properties, *completely exempt* LIHTCs from an assessor's consideration. See *Heron Lake I*, 299 Ga. at 610. Central to that holding was our conclusion that LIHTCs affect "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale," so by categorically exempting LIHTCs from assessors' computation of the fair market value of Section 42 properties, the General Assembly had effectively placed those properties in a distinct subclass of property for taxation purposes, which violated our Constitution's taxation uniformity provision. See id. (citing OCGA § 48-5-2 (3)).

Here, unlike in *Heron Lake I*, we must review the trial court's rulings on two statutory provisions that do not preclude tax assessors from considering LIHTCs when they determine the fair

19

market value of Section 42 properties. In that respect, the provisions at issue here do not directly implicate our Constitution's taxation uniformity provision as did the provision at issue in *Heron Lake I*. So, this case is less about taxation uniformity and more about the propriety of the two methods of determining the fair market value of Section 42 properties that the General Assembly enacted in 2017.

> At the outset, we note our well-settled principle that

> all presumptions are in favor of the constitutionality of an act of the legislature and that before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be constitutional until the contrary appears, the burden is on the party alleging a statute to be unconstitutional to prove it.

*Dev. Auth. of DeKalb County v. State of Ga.*, 286 Ga. 36, 38 (1) (684 SE2d 856) (2009) (citations and punctuation omitted). Moreover, we have long held that if "the language of an act is susceptible of a construction that is constitutional, and another that would be unconstitutional, that meaning or construction will be applied which will sustain the act." *HCA Health Svcs. v. Roach*, 265 Ga. 501, 503

20

(2) (458 SE2d 118) (1995) (citation and punctuation omitted).

In this case, the Board has failed to carry its heavy burden of demonstrating that a "clear and palpable" conflict exists between the 2017 amendment and the taxation uniformity provision. See *Dev. Auth. of DeKalb County*, 286 Ga. at 38 (2) (upholding the constitutionality of bond referendum requirement). We conclude that, in passing the 2017 amendment at issue, the General Assembly acted within its broad authority to establish methods of tax assessment, and that the amendment does not run afoul of the Georgia Constitution's taxation uniformity provision.

First, following our decision in *Heron Lake I*, the General Assembly acted to give tax assessors a basis upon which to assess ad valorem taxes on Section 42 properties. The 2017 amendment is consistent with the primary teaching of *Heron Lake I*, because it does not altogether preclude tax assessors from considering LIHTCs as part of the fair market value of Section 42 properties. See *Heron Lake I*, 299 Ga. at 610.

Secondly, the Board has failed to show that the specific

21

methodologies adopted in the 2017 amendment are improper. As we have long held:

> [T]here is no requirement that the same method be utilized to determine what the fair market value [of tangible property and realty] is. Quite to the contrary, the court has repeatedly held that the utilization of different methods to determine fair market value does not contravene the Constitution or the laws of Georgia.

*Dougherty County Bd. of Tax Assessors v. Burt Realty Co.*, 250 Ga. 467, 469 (298 SE2d 475) (1983). Moreover, our Constitution's uniformity taxation provision does not preclude tax assessors from "apply[ing] different methods of arriving at the fair market value of tangible property." *Rogers v. DeKalb County Bd. of Tax Assessors*, 247 Ga. 726, 728 (2) (279 SE2d 223) (1981). Finally, the question in such cases is whether the valuation method used fairly and justly establishes the fair market value of the property, such that the method is not "arbitrary or unreasonable." *Sherman v. Fulton County Bd. of Assessors*, 288 Ga. 88, 91-93 (701 SE2d 472) (2010) (punctuation omitted) (quoting *DeKalb County Bd. of Tax Assessors v. W. C. Harris & Co.*, 248 Ga. 277, 281 (3) (282 SE2d 880) (1981)).

The two methodologies at issue here are neither arbitrary nor unreasonable. Rather, they are reasonable approaches for tax assessors to use in carrying out their complex duty of computing the fair market value of Section 42 property. As for the sales comparison approach, in OCGA § 48-5-2 (3) (B) (vii) (I), the General Assembly reasonably limited that approach to situations in which the property being assessed could be most fairly compared to sales of other Section 42 properties with unused tax credits. First, the General Assembly limited the scope of that approach, because, as both parties agree, sales of such properties rarely occur. Second, in limiting the applicability of the sales comparison approach to situations in which it is appropriate, the General Assembly attempted to ensure that when tax assessors use that approach, it yields fair and accurate results.[8] Third, despite its limiting effect,

---

[8] The Louisiana Supreme Court has also recognized the difficulty in valuing Section 42 properties using a comparable sales approach. See *Williams v. Opportunity Homes*, 240 S3d 161, 168-169 (La. 2018) (noting that the value of Section 42 properties is unique because of impediments federal regulations place on those properties, and concluding it would not be appropriate to compare those properties with economically dissimilar unregulated commercial property).

OCGA § 48-5-2 (3) (B) (vii) (I) may provide assessors with a methodology that is appropriate in the future, and we decline to speculate that a sale of a Section 42 property with unused LIHTCs will *never* occur. For those reasons, OCGA § 48-5-2 (3) (B) (vii) (I)'s sales comparison approach is not arbitrary or unreasonable. See *DeKalb County Bd. of Tax* Assessors, 248 Ga. at 281 (3).

With respect to the income approach, consistent with our conclusion above — that LIHTCs as currently structured do not constitute "actual income" for the purposes of OCGA § 48-5-2 (3) (B) (vii) (II) — we agree that this method has a narrow range of potential applications. But that does not mean that it cannot be applied in *any* circumstances, or that it is arbitrary or unreasonable. For example, while we hold that today's LIHTCs cannot be counted as "actual income" under the income approach, we do not hold that the statute cannot be applied as written — i.e., in circumstances where a tax assessor could show that LIHTCs "generate actual income," such as where LIHTCs resulted in a net payment to the taxpayer rather than merely reducing her tax liability. Cf. OCGA § 48-7-40.36 (g) (1)

24

(providing refundable income tax credits to timber farmers impacted by Hurricane Michael). And for those reasons, OCGA § 48-5-2 (3) (B) (vii) (II)'s income approach is not arbitrary or unreasonable. See *DeKalb County Bd. of Tax Assessors*, 248 Ga. at 281 (3).

Thus, OCGA § 48-5-2 (3) (B) (vii) (I) and (II) are not unconstitutional, because they do not completely preclude tax assessors from considering LIHTCs in determining fair market value; rather, they simply limit the applicability of the sales comparison and income approaches. And given the difficulties inherent in determining the fair market value of Section 42 properties, there is nothing arbitrary or unreasonable about the General Assembly's limiting use of those approaches to situations where they can be accurately and fairly applied based upon reliable data.

Finally, we also note that, in determining the fair market value of Section 42 properties, tax assessors are not limited to using either the sales comparison or income approaches. For example, OCGA § 48-5-2 (3) (B) (viii) directs tax assessors to apply — among other

25

criteria — "*[a]ny other existing factors provided by law or by rule and regulation of the commissioner* [of revenue]" when determining the fair market value of real property. (Emphasis supplied.) Furthermore, the Appraisal Procedures Manual — which is part of the Department of Revenue's regulations — directs appraisers to consider the sales comparison, income, and cost[9] approaches in determining the fair market value of real property, but it expressly states that "[i]rrespective of the valuation approach used, the result of any appraisal of real property . . . shall conform to the definition of fair market value." Ga. Comp. R. & Regs. r. 560-11-10-.09 (1). See also Ga. Comp. R. & Regs. r. 560-11-10-.09 (1) (a), (4) (a)-(c).

The Appraisal Procedures Manual also explains that most of the valuation procedures and methods it prescribes "are designed to provide fair market value *under normal circumstances*." Ga. Comp. R. & Regs. r. 560-11-10-.01 (2) (emphasis supplied). In recognition of

---

[9] As stated in the Appraisal Procedures Manual, the cost approach estimates the cost of new improvements to a property, subtracts accrued depreciation, and then adds in the value of the land. See Ga. Comp. R. & Regs. r. 560-11-10-.09 (4) (a).

the fact that nearly all real property is unique in one way or another, the Appraisal Procedures Manual states that "[w]hen unusual circumstances are affecting value, they should be considered." Id. Moreover, the Appraisal Procedures Manual provides that appraisal staff may use generally accepted appraisal practices set forth by both the Appraisal Foundation and the International Association of Assessing Officers, so long as those practices are consistent with the Appraisal Procedures Manual and Georgia law. Ga. Comp. R. & Regs. r. 560-11-10-.01 (4).

In short, OCGA § 48-5-2 (3) (B) (vii) (I) and (II) do not violate our Constitution's taxation uniformity provision, nor are they arbitrary or unreasonable. Moreover, tax assessors have alternative methods of assessing the fair market value of Section 42 properties. Therefore, OCGA § 48-5-2 (3) (B) (vii) (I) and (II) are not unconstitutional, and we reverse the judgment of the trial court.

*Judgment reversed. All the Justices concur, except Bethel and Ellington, JJ., disqualified.*

DECIDED SEPTEMBER 23, 2019.

Taxation; constitutional question. Lowndes Superior Court. Before Judge Altman.

*The Barnes Law Group, Roy E. Barnes, John R. Bartholomew, Powell & Waters, Alfred J. Powell, Jr., Coleman Talley, Edward F. Preston*, for appellants.

*Elliott, Blackburn & Gooding, Walter G. Elliott*, for appellee.

*Arnall Golden Gregory, Henry R. Chalmers, Jennifer L. Shelfer, Jeffrey C. Adams; Christopher M. Carr, Attorney General, W. Wright Banks, Jr., Deputy Attorney General, Alex F. Sponseller, Senior Assistant Attorney General, Oliver tum Suden, Assistant Attorney General, Andrew A. Pinson, Solicitor-General*, amici curiae.